IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JEFFREY T. STRAUSS, derivatively on behalf of AFFILIATED COMPUTER SERVICES, INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JEFFREY A. RICH, MARK A. KING, and AFFILIATED COMPUTER SERVICES, INC.,<br><br>　　　　Defendants. | Civil Action No. 06-318 (SLR) |

## NOMINAL DEFENDANT AFFILIATED COMPUTER SERVICES, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

Nominal defendant Affiliated Computer Services, Inc. ("ACS" or the "Company") respectfully submits this reply memorandum of law in further support of its motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failing to comply with the demand requirements of Section 16(b) of the 1934 Securities Exchange Act ("Section 16(b)").

　　　　1.　　As explained in ACS's Opening Brief, Section 16(b) allows a stockholder to seek the disgorgement of alleged short-swing profits *only if* the stockholder first makes a demand on the company to bring suit to recover those profits, and the company thereafter fails or refuses to bring such suit within sixty days of the request. See ACS Op. Br. 1-2; Heit v. Gulf & Western Indus., Inc., 321 F. Supp. 921, 923 (D. Del. 1971) (recognizing that requiring a stockholder to make a demand before

suing to recover short-swing profits under Section 16(b) is consistent with "statutory policy," and not merely a "technical" requirement that can be ignored); see also Kanbar v. U.S. Healthcare, Inc., Civ. A. No. 89-5543, 1989 WL 136522, at *5 (E.D. Pa. Nov. 8, 1989) (dismissing a Section 16(b) claim where the complaint fails to allege that a demand was made on the corporation's board), aff'd mem., 908 F.2d 962 (3d Cir. 1990).

2.   Plaintiff admits that he failed to make a demand on the ACS board before filing his lawsuit. (Compl. ¶ 17.) And in his Answering Brief, Plaintiff fails to distinguish *any* of the cases cited in ACS's Opening Brief that hold that a stockholder is required, under the express terms of the statute, to make a demand on the corporation before instituting a Section 16(b) lawsuit. In fact, Plaintiff all but concedes that demand is a prerequisite to filing a Section 16(b) lawsuit. See Pl.'s Ans. Br. 23 (remarking that the demand requirement is to "allow the corporation to address the issue *before* allowing the shareholder to vindicate Congressional policy"); see also Pl.'s Ans. Br. 24 (commenting that the demand requirement "is simply a timing issue, allowing the company to pursue the claim *in the first instance* . . . but not foreclosing *subsequent* shareholder suit.") (emphasis added). Accordingly, the Court may dismiss this lawsuit on the ground that Plaintiff failed to comply with the statutory prerequisites for filing a Section 16(b) claim, by failing to make a demand.

3.   Instead of addressing directly ACS's argument that demand in the Section 16(b) context is an unavoidable statutory prerequisite to filing suit, Plaintiff instead offers three reasons why making a demand under the circumstances here would be "futile." As explained below, each is without merit.

4. *First*, Plaintiff continues to suggest, without any support, that demand was excused because Defendants Rich and King "control the Company and its Board of Directors." (Pl.'s Ans. Br. 24 n.5.) As explained in ACS's Opening Brief, this conclusory assertion does not adequately allege demand futility. ACS Op. Br. 3-4 (citing Morales v. Regent Techs., Inc., No. 98 CIV. 112(RO), 1998 WL 240490, at *1 (S.D.N.Y. May 12, 1998)). Indeed, Plaintiff does not bother to refute any of ACS's authority or arguments on this point. Moreover, Plaintiff fails to allege the number of shares of ACS stock that Rich and King own, or what percentage of the shareholder vote they are alleged to control. Plaintiff also never bothers to explain how Rich (who is not even a board member and, in fact, is no longer employed by ACS) and King (who is just one member of ACS's *seven-member* board of directors) could possibly "control" the ACS board to the point where demand is futile. Plaintiff's silence on these issues speaks volumes about the Complaint's deficiencies.[1]

5. *Second*, Plaintiff argues that demand is futile by virtue of the fact that ACS has not intervened, or sought to intervene, in this action. (Pl.'s Ans. Br. 24-26.) This argument must fail. As (then) Vice Chancellor Longobardi once remarked when rejecting a similar argument:

> The theory, I presume, is "if they were inclined to sue, they would have done so before now." Such conclusions have no basis in fact and in law. There may have been very good reasons why [the defendant company] has decided not to sue. The point is, however, we do not know why they elected not to sue. The mere fact that they have not elected to sue before

---

[1] Plaintiff's citations in support of his claim that demand is futile because Defendants "control" the Company are entirely misplaced. For example, in Netter v. Ashland Paper Mills, the court found that demand was futile because Plaintiff alleged facts showing that an individual defendant owned and controlled *more than half the corporation's stock* and the board of directors was composed of the defendant *and his family*. 19 F.R.D. 529, 531 (S.D.N.Y. 1956). In contrast, Plaintiff here has not alleged anything about Rich and King's respective stockholdings, and has failed to allege any specific allegations that suggest that Rich and King "control" or "dominate" the other members of the ACS board.

3

the derivative action was filed should not of itself indicate "interestedness."

See, e.g., Richardson v. Graves, C.A. No. 6617, 1983 WL 21109, at *3 (Del. Ch. June 17, 1983).

      6.    Similarly, the Court should not draw any negative inferences about demand futility from the fact that ACS has filed a motion to dismiss Plaintiff's lawsuit. As explained in ACS's Opening Brief, the purpose of the Section 16(b) demand requirement is to provide a company with an opportunity to employ intra-corporate remedies in the hopes of avoiding litigation. ACS Op. Br. 2 (citing Colan v. Monumental Corp., 524 F. Supp. 1023, 1027-28 (N.D. Ill. 1981)). ACS has the statutory right, in the first instance, to determine whether and how to pursue all remedies available to the corporation to seek disgorgement of alleged short-swing profits. ACS's decision not to intervene in this particular action *at this time*, should not be considered tantamount to an inability or unwillingness to act in the shareholders' best interests. The approach Plaintiff asks the Court to adopt would ignore the legislature's mandate and statutory demand requirement, and functionally eliminate all demand requirements by permitting a plaintiff to sue first and proclaim futility whenever the corporation does not subsequently intervene.[2]

      7.    In addition, whether or not demand is futile is determined as of the time the litigation was filed. See, e.g., Cramer v. Gen. Tel. & Electronics Corp., 582 F.2d

---

[2] Though the Court need not consider this for purposes of deciding this motion to dismiss, it is important to note that Plaintiff's argument overlooks that ACS, through its independent directors, commenced an internal investigation into the historical stock option granting practices at ACS. The internal investigation is ongoing and is not complete at this time. See Affiliated Computer Services, Inc., Form 10-Q, 7-8 (May 15, 2006) (Ex. A, Relevant Excerpt); Press Release, Affiliated Computer Services, Inc., ACS Update Regarding Stock Option Investigation (Aug. 7, 2006) (Ex. B, Relevant Excerpt).

259, 276 (3d Cir. 1978) (holding the futility of demand must be gauged at the time plaintiff files a derivative complaint). Thus, whether or not ACS has elected to intervene as some point *after* the litigation has been filed should have no bearing on the Court's consideration of demand futility.[3]

8.      *Third*, Plaintiff suggests that his failure to make a demand should be excused due to Section 16(b)'s two-year statute of limitations period. (Pl.'s Ans. Br. 26-27.) This argument is without merit. Though Plaintiff refers to two cases where courts have waived the sixty-day waiting period required by Section 16(b) because the statute of limitations would run on the claims prior to the end of sixty days, *demand was made in both cases before the lawsuit was filed*. See Morales v. Mylan Laboratories, Inc., 443 F. Supp. 778, 780 (W.D. Pa. 1978) (stating, in dicta, that the running of the statute of limitations may be a legitimate reason to waive the sixty-day requirement if the plaintiff has made demand); see also Benisch v. Cameron, 81 F.Supp. 882, 885 (S.D.N.Y. 1948) (demand was made; plaintiff instituted suit prior to expiration of sixty-day waiting period). At most, the cases Plaintiff relies upon establish that the 60-day requirement may only be waived *after* the filing of a sufficient demand *if* an extenuating circumstance justifies the Plaintiff's haste.[4] Because Plaintiff did not even make a demand here, the presence of extenuating circumstances, if any, is irrelevant.

---

[3]     The cases cited by Plaintiff to support his position are inapposite. In Grossman v. Young, the plaintiffs *made demand* on the board prior to bringing suit. Grossman v. Young, 72 F. Supp. 375, 380 (S.D.N.Y 1947). In Berkwich v. Mencher, the corporation announced in a proxy statement before litigation was filed its intention not to pursue 16(b) claims. 239 F. Supp. 792, 793 (S.D.N.Y. 1965).

[4] Moreover, the cases cited by Plaintiff were not decided on the ground that the statute of limitations waives the demand requirement. They were decided on the ground that the individual defendants were the party making the motion to dismiss for failure to wait sixty days after demand was made; which is not the case here. See Morales v. Mylan Laboratories, Inc., 443 F.Supp. 778, 779 (W.D. Pa. 1978) (individual

9.  For these reasons and those set forth in its Opening Brief, ACS respectfully requests that the Court grant ACS's motion to dismiss the Complaint for failure to comply with the demand requirements of Section 16(b).

Respectfully submitted,

/s/ Edward B. Micheletti
Edward P. Welch (I.D. # 671)
ewelch@skadden.com
Edward B. Micheletti (I.D. # 3794)
emich@skadden.com
Nicole A. DiSalvo (I.D. # 4662)
ndisalvo@skadden.com
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
P. O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000
Attorneys for Affiliated Computer Services, Inc.

DATED: October 25, 2006

---

defendant cannot raise objection if plaintiff fails to wait sixty days to file suit after making demand; corporation must make objection); Benisch v. Cameron, 81 F.Supp. 882, 885 (same).

6

# EXHIBIT A

# AFFILIATED COMPUTER SERVICES INC

## FORM 10-Q
(Quarterly Report)

Filed 5/15/2006 For Period Ending 3/31/2006

| | |
|---|---|
| Address | 2828 N HASKELL AVE PO BOX 219002 |
| | DALLAS, Texas 75204 |
| Telephone | 214-841-6111 |
| CIK | 0000002135 |
| Industry | Computer Services |
| Sector | Technology |
| Fiscal Year | 06/30 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Onlines Terms of Use.

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D. C. 20549

# FORM 10-Q

(Mark One)

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended <u>March 31, 2006</u>

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the period from _____ to _____

Commission file number <u>001-12665</u>

# AFFILIATED COMPUTER SERVICES, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 51-0310342 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 2828 North Haskell, Dallas, Texas | 75204 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code (214) 841-6111

**Not Applicable**
(Former name, former address and former fiscal year, if changed since last report.)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. <u>(Check one):</u>

Large accelerated filer ☑         Accelerated filer ☐         Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☑

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date.

| Title of each class | Number of shares outstanding as of May 11, 2006 |
|---|---|
| Class A Common Stock, $.01 par value | 111,972,827 |
| Class B Common Stock, $.01 par value | 6,599,372 |

Table of Contents

## AFFILIATED COMPUTER SERVICES, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## (UNAUDITED)

SFAS 123(R) requires that we recognize compensation expense for only the portion of share-based payment arrangements that are expected to vest. Therefore, we apply estimated forfeiture rates that are based on historical employee termination behavior. We periodically adjust the estimated forfeiture rates so that only the compensation expense related to share-based payment arrangements that vest are included in wages and benefits. If the actual number of forfeitures differs from those estimated by management, additional adjustments to compensation expense may be required in future periods.

We follow the transition method described in SFAS 123(R) for calculating the excess tax benefits available to absorb tax deficiencies recognized subsequent to the adoption of SFAS 123(R) (the "APIC Pool"). Tax deficiencies arise when actual tax benefits we realize upon the exercise of stock options are less than the recorded tax benefit. In November 2005, the Financial Accounting Standards Board issued FASB Staff Position FAS 123(R)-3, "Transition Election to Accounting for the Tax Effects of Share-Based Payment Awards" ("FSP FAS 123(R)-3"), which provides an alternative one-time transition election for calculating the APIC Pool. We are currently evaluating whether to elect the one-time transition election provided in FSP FAS 123(R)-3.

## 3. REVIEW OF STOCK OPTION GRANT PROCEDURES

As previously announced, we received a letter dated March 1, 2006 from the Securities and Exchange Commission (the "SEC") informing us that the SEC had begun an informal investigation into stock option grants made by us from October 1998 through March 2005. We are cooperating with the SEC in connection with its investigation.

At the direction of our Board of Directors, in response to the informal SEC investigation noted above, we have commenced an internal investigation through our regular outside counsel into our historical stock option practices from 1994 to the present under our stock option plans in effect during this period, including a review of our underlying option grant documentation and procedures. Our internal investigation is ongoing and not complete as of the date of this filing.

As explained more fully below, during our entire history as a public company, our regular and special compensation committees have generally utilized unanimous written consents signed by all members of the applicable committee ratifying their prior verbal approvals of option grants to senior executives or options to be granted in connection with significant acquisitions. We believe the prior verbal approvals of the committee members generally occurred contemporaneously with the legal effective date specified in the unanimous written consent of the committee members. Our legal counsel has advised us that our written consent process with deemed effective dates is valid under Delaware corporate law and our stock option plans. However, we have determined, in consultation with our independent registered public accounting firm, that although the option grants are legally valid and enforceable as of the effective date set forth in the unanimous consents, the proper measurement date, for accounting purposes only, may differ from the legal effective date.

Historically, we have granted stock options principally utilizing a process whereby our compensation committee or special compensation committee, as applicable, would approve stock option grants through unanimous written consents with specified effective dates that generally preceded the date on which the consents had been executed by all members of the applicable compensation committee. In connection with option grants to senior executives, the historical practice was for our chairman, who during periods prior to September 2003 was also a member of our compensation committee, to engage, on a generally contemporaneous basis with the effective date specified in the written consent, in individual telephonic discussions with each of the members of the applicable compensation committee, during which the committee member would indicate his approval of the option grants in question. In connection with significant acquisitions, our historical practice was for the Board of Directors (including members of the applicable compensation committee) to consider during board meetings convened for the purpose of approving an acquisition the proposed stock option component that would be designated to an acquisition target's management team, with a unanimous written consent of the applicable compensation committee to follow at a later time with a specified effective date for the option grants in question.

Table of Contents

## AFFILIATED COMPUTER SERVICES, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## (UNAUDITED)

Based on our option grant procedures, we have historically considered the effective date specified in the written consents by the applicable compensation committee as the accounting measurement date for determining stock-based compensation expense under APB 25 and SFAS 123 (R). However, we have determined, in consultation with our independent registered public accounting firm, that the proper accounting measurement date for stock option awards cannot precede the date on which the grants were approved through the execution of written consents or through a valid meeting of the applicable compensation committee. Notwithstanding our accounting determination noted above, we believe that (i) our historical written consent effective date process is permitted under our current and predecessor stock option plans and Delaware corporate law, (ii) we have consistently followed this process in prior accounting periods, and (iii) the grants in question had been verbally discussed and approved by each of the members of the applicable compensation committee generally on a contemporaneous basis with the specified effective date of those grants.

Accordingly, based on the preliminary results of our review of our historical stock option practices, including our underlying option grant documentation and procedures, and the initial findings of our internal investigation (which is ongoing and not complete as of the date of this filing), we have determined that the estimated cumulative pretax stock-based compensation charge resulting from revised measurement dates is approximately $32 million ($21 million, net of income tax) at June 30, 2005. Based on this preliminary estimate, had this estimated compensation charge been reflected, as and when incurred, in our results of operations in prior years, the impact on net income for fiscal years ended June 30, 2001, 2002, 2003, 2004 and 2005 would have been a reduction of 1.9%, 1.6%, 1.5%, 0.7%, and 0.7%, respectively. The potential impact of this estimated compensation charge for the fiscal years ended June 30, 2006 and beyond is estimated to be immaterial based on currently available information. There would be no impact on revenue or net cash provided by operating activities as a result of the estimated compensation charge. This estimated stock-based compensation charge relates to certain of the option grants covering approximately 23 million common shares (after giving effect to forfeitures of option grants covering approximately 7 million common shares) issued by us subsequent to our initial public offering in 1994 and through June 30, 2005. During this same period, we recorded a cumulative pretax profit of approximately $3.2 billion ($2.0 billion, net of income tax).

Our internal investigation is ongoing and not complete as of the date of this filing, therefore, should additional information become available, our preliminary estimate of stock-based compensation could change. Accordingly, once our internal investigation is completed, we will conclude as to whether the cumulative stock-based compensation charge will be recorded in our fourth quarter of fiscal year 2006 or will result in a restatement of prior period financial statements. Based on the current estimate of the stock-based compensation charge, we do not believe that restatement of prior period financial information will be required.

In conjunction with this investigation, we are also evaluating whether any previously deducted compensation related to exercised stock options may be non-deductible under Section 162(m) of the Internal Revenue Code. In that event, we may be required to pay additional taxes and interest associated with previous compensation deductions in connection with such exercised stock options and we may lose additional deductions in future periods. We currently estimate that the amount of any lost tax deductions claimed on previously filed income tax returns will not be material to our consolidated results of operations or financial position, although we have not finalized our assessment of this matter.

Notwithstanding the above-referenced accounting determination, based on the initial findings of our internal investigation (which is ongoing and not complete as of the date of this filing), we do not believe that any director or officer of the Company has engaged in the intentional backdating of stock option grants in order to achieve a more advantageous exercise price.

# EXHIBIT B

# AFFILIATED COMPUTER SERVICES INC

FORM 8-K
(Current report filing)

Filed 8/7/2006 For Period Ending 8/7/2006

| | |
|---|---|
| Address | 2828 N HASKELL AVE PO BOX 219002 |
| | DALLAS, Texas 75204 |
| Telephone | 214-841-6111 |
| CIK | 0000002135 |
| Industry | Computer Services |
| Sector | Technology |
| Fiscal Year | 06/30 |

Powered By EDGAR Online
http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Onlines Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported):
August 7, 2006

# Affiliated Computer Services, Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 1-12665 | 51-0310342 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

2828 North Haskell Avenue
Dallas, Texas 75204
(Address of principal executive offices, including zip code)

(214) 841-6111
(Registrant's telephone number including area code)

Not Applicable
(Former name or former address if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-14(c) under the Exchange Act (17 CFR 240.13e-14(c))

Exhibit 99.1

FOR IMMEDIATE RELEASE

| Analyst Contact | Media Contact |
|---|---|
| Warren Edwards | Lesley Pool |
| Executive Vice President/ | Senior Vice President/ |
| Chief Financial Officer | Chief Marketing Officer |
| Affiliated Computer Services, Inc. | Affiliated Computer Services, Inc. |
| 214-841-8082 | 214-841-8028 |
| warren.edwards@acs-inc.com | lesley.pool@acs-inc.com |

## ACS Update Regarding Stock Option Investigation

**DALLAS, TEXAS:** August 7, 2006 — Affiliated Computer Services, Inc., (NYSE: ACS), a premier provider of business process outsourcing and information technology solutions announced, as previously disclosed in the Company's SEC filings, that the Company is conducting an internal investigation into its historical stock option practices during the period 1994 to date in response to a pending informal investigation by the Securities and Exchange Commission and a grand jury subpoena issued by the United States Attorney for the Southern District of New York. The Company is cooperating with these governmental investigations. The Company is providing this update as it will not be addressing this matter on the Company's fourth quarter of fiscal year 2006 earnings conference call on Wednesday, August 9, 2006. Further, when announced later this week, the Company's results for both the fourth quarter and total fiscal year 2006 will not take into consideration the resolution of the stock-based compensation charge related to the investigation.

ACS' internal investigation is being conducted under the direction of its Board of Directors utilizing the Company's regular outside legal counsel, which was not involved in the Company's historical stock option grant processes, and specially-engaged outside legal counsel. Members of the ACS Audit Committee have also been monitoring the investigation, and since late July 2006 the Audit Committee has been utilizing its own specially-engaged independent outside legal counsel for this purpose. ACS currently believes that its internal investigation should be substantially complete during September 2006. Following the completion of its internal investigation, ACS intends to announce updated findings therefrom, including (i) an updated summary of the Company's historical stock option practices, (ii) an updated estimate of the cumulative pretax stock-based compensation charge that will be required as a result of such practices, (iii) whether the updated charge will require the restatement of any prior period financial statements, and (iv) the likely impact of such practices on any related tax deductions previously claimed by the Company. The Company's previously disclosed preliminary findings regarding these matters were set forth in Note 3 to its consolidated financial statements included in its Form 10-Q for the quarterly period ended March 31, 2006. The information set forth in that note, which can no longer be relied upon, will be superceded by the Company's updated announcement. All other portions of that Form 10-Q remain unchanged and continue to be reliable, including the financial statements and other notes thereto included therein which did not give effect to the information set forth in Note 3 due to the preliminary nature thereof.

ACS, a FORTUNE 500 company with more than 55,000 people supporting client operations in nearly 100 countries, provides business process outsourcing and information technology

solutions to world-class commercial and government clients. The Company's Class A common stock trades on the New York Stock Exchange under the symbol "ACS." ACS makes technology work. Visit ACS on the Internet at www.acs-inc.com.

All statements in this news release that are not based on historical fact are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 and the provisions of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (which Sections were adopted as part of the Private Securities Litigation Reform Act of 1995). While management has based any forward-looking statements contained herein on its current expectations, the information on which such expectations were based may change. These forward-looking statements rely on a number of assumptions concerning future events and are subject to a number of risks, uncertainties, and other factors, many of which are outside of our control, that could cause actual results to materially differ from such statements. Such risks, uncertainties, and other factors include, but are not necessarily limited to, those set forth in the Company's prior filings with the Securities and Exchange Commission, including those set forth under the caption "Risk Factors" in the most recent quarterly report on Form 10-Q filed on May 15, 2006. In addition, we operate in a highly competitive and rapidly changing environment, and new risks may arise. Accordingly, investors should not place any reliance on forward-looking statements as a prediction of actual results. We disclaim any intention to, and undertake no obligation to, update or revise any forward-looking statement.

—end—

## CERTIFICATE OF SERVICE

I, Edward B. Micheletti, hereby certify that on October 25, 2006 a copy of Nominal Defendant Affiliated Computer Services., Inc.'s Reply Memorandum in Support of its Motion to Dismiss was served electronically by CM/ECF upon the following counsel of record:

| | |
|---|---|
| Allen M. Terrell, Esquire<br>RICHARDS, LAYTON & FINGER<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801 | Theodore J. Tacconelli, Esquire<br>FERRY, JOSEPH & PEARCE, P.A.<br>824 Market Street<br>P.O. Box 1351<br>Wilmington, DE 19899 |

/s/ Edward B. Micheletti
Edward P. Welch (I.D. No. 671)
ewelch@skadden.com
Edward B. Micheletti (I.D. No. 3794)
emich@skadden.com
Nicole A. DiSalvo (I.D. No. 4662)
ndisalvo@skadden.com
Skadden, Arps, Slate, Meagher
  & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000