## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JEFFREY T. STRAUSS, derivatively on behalf of AFFILIATED COMPUTER SERVICES, INC.,<br><br>       Plaintiff,<br><br>       v.<br><br>JEFFREY A. RICH, MARK A. KING, and AFFILIATED COMPUTER SERVICES, INC.,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 06-318-SLR<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF HARRY TASHJIAN, IV, ESQ.

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) §§: |
| COUNTY OF NEW CASTLE | ) |

Harry Tashjian, IV, having been first duly sworn according to law, hereby deposes and states as follows:

A.     My name is Harry Tashjian, IV. I am an associate attorney practicing at the firm of Richards, Layton & Finger, PA, One Rodney Square, Wilmington, DE 19899.

B.     I am counsel for defendants Jeffery A. Rich and Mark A. King in the above-captioned matter.

C.     I submit this affidavit in support of Defendants Jeffrey A. Rich and Mark A. King's Opening Brief In Support Of Their Motion To Transfer Or, In The Alternative, Motion To Stay.

D.     Attached hereto as Exhibits are, to the best of my knowledge, true and correct copies of the following documents:

- 1 -

(1) Attached to this Affidavit as **Exhibit A** is the consolidated derivative complaint filed on October 11, 2006 in *In re Affiliated Computer Services Derivative Litigation* (Master File No. 3:06-cv-1110-M) which is pending in the United States District Court in and for the Northern District of Texas, Dallas Division.

(2) Attached to this Affidavit as **Exhibit B** are the Judicial Caseload Profiles for the United States District Courts for the District of Delaware and the Northern District of Texas, last accessed from http://www.uscourts.gov/cgi-bin/cmsd2006.pl on April 24, 2007.

(3) Attached to this Affidavit as **Exhibit C** are Nominal Defendant Affiliated Computer Services, Inc.'s Pre-Discovery Disclosures Pursuant To Federal Rule Of Civil Procedure 26(a)(1), served in the above-captioned action on March 5, 2007.

_____
Harry Tashjian, IV, Esq.


SWORN AND SUBSCRIBED before me
the 24th day of April, 2007.

~~Notary Public~~    (DSBA No. 3994)
                     Richard P. Rolls

My Commission expires ___N/A___.

- 2 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2007, I caused the foregoing document to be electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Theodore J. Tacconelli
FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
Wilmington, DE 19899

Edward B. Micheletti
Nicole A. DiSalvo
SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
One Rodney Square
Wilmington, DE 19801


Harry Tashjian, IV (#4609)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899-0551
(302) 651-7500
Tashjian@rlf.com

# EXHIBIT A

ALL-STATE LEGAL® 800-222-0510   EDS11   RECYCLED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| In re AFFILIATED COMPUTER SERVICES DERIVATIVE LITIGATION | § § § | Master File No. 3:06-cv-1110-M |
| | § | |
| This Document Relates To: | § § § | |
| ALL ACTIONS. | § § | |
| | § | DEMAND FOR JURY TRIAL |

**VERIFIED CONSOLIDATED SHAREHOLDERS DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CONSTRUCTIVE FRAUD, CORPORATE WASTE, UNJUST ENRICHMENT, GROSS MISMANAGEMENT, BREACH OF CONTRACT AND ACTION FOR ACCOUNTING**

## SUMMARY AND OVERVIEW OF THE ACTION

1.      This is a shareholders derivative action on behalf of nominal defendant Affiliated Computer Services, Inc. ("ACS" or the "Company") against its entire Board of Directors and certain top officers for violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement which have caused damage to ACS. This action arises out of defendants' causing or permitting the backdating of stock option grants to and for the benefit of ACS's directors and top executive officers, including the Company's former Chief Executive Officer Jeffrey Rich ("Rich"), and/or failing to properly investigate whether these grants had been improperly made. Each of the defendants also participated in the concealment of the backdating option scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these insiders to disgorge the illicitly obtained incentive compensation and proceeds diverted to them since at least 1995. Each of the defendants either knew of the backdating and were participants in the unlawful conduct or should have known of this conduct and done more about it.

2.      Stock option grants give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually does not vest for a year or more, but then it continues for several years. The exercise price is usually the stock's closing price on the date of grant, and the lower the exercise price at the time of the grant, the more valuable the stock option becomes when it vests. According to its public filings with the U.S. Securities and Exchange Commission ("SEC") and materials distributed to shareholders, ACS was no different.

3.      As SEC Chairman Christopher Cox testified before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on September 6, 2006, "backdating" is a practice by which a stock option is publicly reported as having been granted on one date, but is actually backdated by a period of weeks or months to a date where the stock price was trading at a lower price. Such

backdating allows company executives and stock option grantees to realize immediate unearned and undisclosed financial gains at the expense of the company and its shareholders.

4.    On March 18, 2006, in an article entitled "The Perfect Payday: Some CEOs Reap Millions by Landing Stock Options When They Are Most Valuable; Luck – or Something Else?," the *Wall Street Journal* published an analysis of stock options granted to select chief executive officers and directors of several companies, including ACS and defendant Rich. According to the *Wall Street Journal*'s analysis, six options that were granted to defendant Rich between 1995 and 2002 were dated just before a rise in the stock price or at the bottom of a steep drop. With regard to the option backdating scheme at ACS, the *Wall Street Journal* stated, in pertinent part, as follows:

> On a summer day in 2002, shares of Affiliated Computer Services Inc. sank to their lowest level in a year. Oddly, that was good news for Chief Executive Jeffrey Rich.

> His annual grant of stock options was dated that day, entitling him to buy stock at that price for years. Had they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding. It was the same through much of Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.

> Just lucky? *A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote – around one in 300 billion*. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.

> Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. The SEC is understood to be looking at about a dozen companies' option grants with this in mind.

> \*        \*        \*

> *Mr. Rich called his repeated favorable option-grant dates at ACS "blind luck." He said there was no backdating, a practice he termed "absolutely wrong."* A spokeswoman for ACS, Lesley Pool, disputed the Journal's analysis of the likelihood of Mr. Rich's grants all falling on such favorable dates. *But Ms. Pool added that the timing wasn't purely happenstance: "We did grant options when there was a natural dip in the stock price," she said. On March 6, ACS said that the SEC is examining its option grants.*

\*     \*     \*

While most of Mr. Rich's stock-option gains were due to rises in ACS stock, the exceptional timing of grants enhanced his take. If his grants from 1995 through 2002 had come at each year's average share price, rather than the favorable dates, he'd have made about 15% less.

An especially well-timed grant, in which Mr. Rich received 500,000 options at $11.53, adjusted for stock splits, was dated Oct. 8, 1998. This happened to be the bottom of a steep plunge in the price. The shares fell 28% in the 20 trading days prior to Oct. 8, and rose 60% in the succeeding 20 trading days.

ACS's Ms. Pool said the grant was for Mr. Rich's promotion to CEO. He wasn't promoted until February 1999. Ms. Pool said there was a "six-month transition plan," and the Oct. 8 option grant was "in anticipation" of his promotion.

Mr. Rich would have fared far worse had his grant come on the day ACS announced his promotion. The stock by then was more than twice as high. The grant wasn't reported to the SEC until 10 months after the stated grant date. Ms. Pool said that was proper under regulations in place at the time.

A special board committee oversaw Mr. Rich's grants. Most years, its sole members were directors Frank Rossi and Joseph O'Neill. Mr. Rossi declined to comment. *Mr. O'Neill said, "We had ups and downs in our stock price like any publicly traded stock. If there were perceived low points, would we grant options at that point? Yes."*

Mr. Rich said grants were made on the day the compensation committee authorized them, or within a day or so of that. He said he or Chairman Darwin Deason made recommendations to the special board committee about option dates.

Mr. Rich, who is 45 years old, resigned abruptly as ACS's chief executive on a Thursday in September to "pursue other business interests." Again, his timing was advantageous. *In an unusual separation agreement, the company agreed to make a special payment of $18.4 million, which was equal to the difference between the exercise price of 610,000 of his outstanding stock options and the closing ACS stock price on the day of his resignation.*

But the company didn't announce the resignation that day. On the news the next Monday that its CEO was departing suddenly, the stock fell 6%. *Mr. Rich netted an extra $2 million by cashing in the options before the announcement, rather than on the day of it.*

Mr. Rich said ACS signed his separation agreement on Friday, using Thursday's price for the options payout. He said it waited till Monday to release the news because it didn't want to seem "evasive" by putting the news out late Friday.

5.    Defendants attempted to downplay the significance of the March 18, 2006 *Wall Street Journal* article in an April 27, 2006 conference call with analysts. ACS President & CEO, defendant Mark King, stated that "we do not believe that there has been any intentional granting of look-back stock options to executive officers and directors, and we believe our grants have complied with the terms of our stock options plan." King also that the options controversy was a "procedural matter" that the Company would sort out quickly.

6.    Only two weeks later, on May 10, 2006, ACS announced that it could not file its 1stQ06 financial results with the SEC and that ACS would be required to take a charge of approximately *$40 million* because it did not properly account for backdated options. The Company also announced that ACS had begun an internal investigation into stock option practices through its regular outside counsel at the direction of the entire ACS Board of Directors. ACS also reiterated that it was the subject of an SEC investigation. Despite these disclosures, the Company again sought to downplay any wrongdoing and dismiss the possibility that any backdating had occurred:

> Historically, the Company has granted stock options principally utilizing a process whereby its compensation committee or special compensation committee, as applicable, would approve stock option grants through unanimous written consents with specified effective dates that *generally preceded the date on which the consents had been executed* by all members of the applicable compensation committee.
>
> *      *      *
>
> *Notwithstanding the Company's accounting determination noted above*, the Company believes that (i) its historical written consent effective date process is permitted under the Company's current and predecessor stock option plans and Delaware corporate law, (ii) the Company has consistently followed this process in prior accounting periods, and (iii) in many cases, the grants in question had been verbally discussed and approved by each of the members of the applicable compensation committee on a relatively contemporaneous basis with the specified effective date of those grants.

ACS Form 8-K dated May 10, 2006.

- 4 -

7.      Just seven days after the Company's May 10 announcement, ACS received a grand jury document subpoena issued by the United States District Court for the Southern District of New York requesting that the Company produce documents relating to its granting of stock options from 1998 through the present.

8.      Then, on August 7, 2006, ACS *retracted* its May 10, 2006 statement, effectively abandoning its claims that stock options had not been backdated, stating that "previously disclosed preliminary findings regarding" suspected options malfeasance "can no longer be relied upon" because the Company's prior statements would be "superseded by" ACS's disclosure of the result of an internal investigation in September 2006, including a potential restatement of reported financial results. The Company has not yet announced the results of the internal investigation or whether it will need to restate. On September 14, 2006, ACS disclosed that its 2006 report on Form 10-K will be delayed due to the Company's investigation of stock option pricing.

9.      The ACS internal investigation of stock options pricing is being directed by the seven-member Board of Directors through an "Ad Hoc Committee" consisting of the Company's four purportedly independent directors, who also comprise the ACS Audit Committee. Five of the seven members of the Board of Directors, however, either received backdated stock options (defendants Deason, King and Blodgett) or were members of the Compensation Committee (defendants Deason, O'Neill and Rossi) and/or Special Compensation Committee (defendants O'Neill and Rossi) which was directly responsible for awarding ACS stock options between 1995-2002.[1] O'Neill and Rossi are also two of the four members of the Audit Committee, and Rossi is the

---

[1]      Between 1995 and the present, ACS's Compensation Committee and/or Special Compensation Committee approved the persons eligible to receive stock option grants pursuant to the Company's 1988 and 1997 Stock Option Plans, the type of option granted, the number of shares subject to the grant and the terms of the grant, including exercise price and exercise date. O'Neill

Chair of the Audit Committee. In sum, *five of the seven members of the ACS Board of Directors directing the Company's internal investigation received and/or granted backdated stock options and two of the four members of the Ad Hoc Committee directly overseeing the stock option backdating investigation granted backdated stock options.*

10.     The backdating at ACS violated ACS's publicly-disclosed and shareholder-ratified 1988 and 1997 Stock Option Plans, which provided that incentive stock option grants to employees be priced at not less than the fair market value of ACS common stock on the date of the grant, and rendered ACS's 1995-2006 Proxy Statements, 1996-2005 Forms 10-K and 1994 initial public offering Registration Statement and Prospectus false and misleading. Stock options backdating at ACS was thus in breach of defendants' fiduciary duties of good faith, fair dealing and loyalty to ACS and violated the securities laws.

11.     Defendants' conduct has unjustly enriched ACS's top executives, including defendant Rich, to the detriment of ACS. A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price. Backdating options such that they carry a lower price runs counter to this goal, giving the recipient a "paper profit" right from the start. For example, if a company grants options on May 22, when its stock price is $20, but records the date of issue as April 22, when the stock price was only $15, it would be giving those who were granted options a riskless profit.

12.     Due to defendants' conduct, ACS has been exposed to a costly investigation by the SEC, a subpoena from the United States Department of Justice, as well as potentially costly and expensive lawsuits for violations of the federal securities laws and accounting rules applicable to

---

has admitted that the ACS purposefully priced options when it perceived ACS stock to be trading at low prices.

public companies. As former SEC Chairman Harvey Pitt explained, "backdating" plainly violates

both the federal securities laws and state corporate fiduciary laws:

> What's so terrible about backdating options grants?
>
> For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value. But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders.
>
> For another, backdating means a corporate document used to permit access to corporate assets has been falsified, a violation of the Foreign Corrupt Practices Act. Moreover, if backdating occurs without the compensation committee's knowledge, illegal insider trading may also have occurred.
>
> Securities law violations are not the only potential problems with backdating options grants. Backdating may violate the Internal Revenue Code, and companies may not be able to deduct the options payments. On the state level, backdating could involve a breach of fiduciary duty, a waste of corporate assets and even a usurpation of a corporate opportunity.
>
> \*     \*     \*
>
> More fundamentally, the financial statements of a company that has engaged in backdating may require restatement. The options may not be deductible, and the expenses, as well as the various periods to which they may have been allocated, may also be incorrect. . . .
>
> More to the point, what does this kind of conduct say about those who do it and those who allow it to occur (either wittingly or unwittingly)?
>
> Those who backdate options grants violate federal and state law. And those on whose watch this conduct occurs are also potentially liable: If they knew about the backdating, they're participants in fraudulent and unlawful conduct. If they didn't know about the backdating, the question will be: Should they have done more to discover it?

Harvey Pitt, *The Next Big Scandal*, Forbes.com, May 26, 2006. Chairman Pitt further opined that:

> Options backdating calls a company's internal controls into question. Many discussions of backdating start with the observation that backdating is not, per se, illegal. That is wrong. Options backdating frequently involves falsification of records used to gain access to corporate assets. . . . If corporate directors were complicit in these efforts, state law fiduciary obligations are violated. Backdating is not only illegal and unethical, it points to a lack of integrity in a company's internal controls.

Harvey Pitt, *Lessons of the Stock Options Scandal*, Fin. Times, June 2, 2006.

13.     Lynn Turner, the SEC's former Chief Accountant, described undisclosed backdating as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the finish line." Arthur Levitt, former Chairman of the SEC, described backdating as stealing: "It is ripping off shareholders in an unconscionable way" and "represents the ultimate in greed."

14.     Defendants' backdating scheme not only surreptitiously and illegally lined defendants' pockets and caused ACS to issue materially false financial statements, but undermined the key purpose of stock option-based executive compensation, *i.e.*, to provide incentive to improve the Company's performance and increase the Company's stock price and market capitalization. By manipulating options such that they carried a strike price lower than the trading price of the stock on the date of grant, ACS insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition – a situation which President George W. Bush recently declared "bad for America": "[O]vercompensating or trying to *backdate things is ... bad for America*. And there ought to be consequences when people don't tell the truth and are not transparent."

15.     Moreover, as a result of defendants' conduct, ACS's proxy materials filed with the SEC are false and misleading, ACS may be in violation of certain provisions of the Internal Revenue Code since it may not be able to deduct the options payments from its taxable income and the Company has been forced to take a $40 million charge because it improperly accounted for its option grants. The Company may also be required to formally restate its reported earnings for certain years.

16.     By this action, plaintiffs seek to recover damages and other relief against defendants for the severe injuries their misconduct has inflicted upon ACS.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under §§10(b), 14(a), 16(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78n(a), 78p(b) and 78t(a),

- 8 -

and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, and under Delaware law for violations of breach of fiduciary duty, abuse of control, constructive fraud, waste of corporate assets, unjust enrichment and gross mismanagement. In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

18.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

19.    Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. ACS is located in and conducts its business in this District.

## THE PARTIES

20.    Plaintiffs Alaska Electrical Pension Fund, Ann M. Lunceford and Bennett Ray Lunceford, at all relevant times, have been and are shareholders of ACS.

21.    Nominal defendant ACS is a Delaware corporation with its executive offices and principal place of business located in Dallas, Texas. ACS provides business process and information technology outsourcing solutions to commercial and government clients. The Company conducts nearly all of its business in Texas, the wrongdoing complained of herein occurred in Texas, and the false public statements and SEC filings, including Forms 10-K and proxy statements, were created in Texas and sent to shareholders nationwide from Texas.

22.    Defendant Jeffrey Rich ("Rich") was a Director of ACS from August 1991 until September 2005. He was Chief Executive Officer of ACS from February 1999 until September 2005. From April 1995 until August 2002, he was President of ACS. As a member of the Board of

- 9 -

Directors, he caused or permitted the backdated stock options described herein to be granted. He has also personally benefited from the backdated stock options as described herein, including by receiving more than 2 million backdated stock options. Moreover, because of Rich's position, he was aware of non-public information about the business of ACS, as well as its finances, markets, and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, Rich participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Rich signed the ACS 1994 Form S-1 Registration Statement and each of the ACS 1996-2005 Forms 10-K and 10-K405.

23.    Defendant Joseph P. O'Neill ("O'Neill") has been a Director of ACS since November 1994. He has been a member of the ACS Compensation Committee and Special Compensation Committee Compensation[2] (collectively, the "Compensation Committees"), since August 1996. As a member of the Board of Directors and the Compensation Committees, he caused or permitted the backdated stock options described herein to be granted. Moreover, because of O'Neill's position, he was aware of non-public information about the business of ACS, as well as its finances, markets, and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, O'Neill participated in the issuance of false and/or misleading

---

[2]    The Special Compensation Committee was responsible for administering and reviewing the compensation of the executive officers whose compensation exceeded $1 million, by reviewing salaries, recommending bonuses and other forms of additional compensation, including grants of awards under the 1988 and the 1997 Stock Option Plans until September 2003 when it discontinued in favor of a Compensation Committee composed of two purportedly independent directors.

statements, including the preparation of false and/or misleading press releases and SEC filings. O'Neill signed the ACS 1996-2005 Forms 10-K and 10-K405.

24.    Defendant Frank A. Rossi ("Rossi") has been a Director of ACS since November 1994. He was a member of the Compensation Committee and Special Compensation Committee between July 1997 and September 2003. As a member of the Board of Directors and the Compensation Committees, he caused or permitted the backdated stock options described herein to be granted. Moreover, because of Rossi's position, he was aware of non-public information about the business of ACS, as well as its finances, markets, and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, Rossi participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Rossi signed the ACS 1996-2005 Forms 10-K and 10-K405.

25.    Defendant Darwin Deason ("Deason") has been Chairman of ACS since September 1988. From September 1998 until February 1999, Deason was Chief Executive Officer of ACS. He was a member of the Compensation Committee between August 1996 and September 2003. As a member of the Board of Directors and the Compensation Committee, he caused or permitted the backdated stock options described herein to be granted. He has also personally benefited from the backdated stock options as described herein, including by receiving at least 600,000 backdated stock options. Moreover, because of Deason's position, he was aware of non-public information about the business of ACS, as well as its finances, markets, and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, Deason participated in the issuance of false and/or misleading statements, including the preparation of false

- 11 -

and/or misleading press releases and SEC filings. Deason signed the ACS 1994 Form S-1 Registration Statement and each of the ACS 1996-2005 Forms 10-K and 10-K405.

26.     Defendant J. Livingston Kosberg ("Kosberg") has been a Director of ACS since September 2003. He has been a member of the Compensation Committee since September 2003. As a member of the Board of Directors and the Compensation Committee, defendant Kosberg knew non-public information about the business of ACS, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the relevant period, Kosberg participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Kosberg signed the ACS 2003-2005 Forms 10-K.

27.     Defendant Mark King ("King") has been a Director of ACS since October 1996. He has been President and Chief Executive Officer of ACS since September 2005. From August 2002 until September 2005, he was President and Chief Operating Officer of ACS; from March 2001 until August 2002, he was Chief Operating Officer of ACS; and from May 1995 until March 2001, he was Executive Vice President and Chief Financial Officer of ACS. As a member of the Board of Directors, he caused or permitted the backdated stock options described herein to be granted. He has also personally benefited from the backdated stock options as described herein, including by receiving more than 350,000 backdated stock options. Moreover, because of King's position, he was aware of non-public information about the business of ACS, as well as its finances, markets, and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, King participated in the issuance of false and/or misleading

- 12 -

statements, including the preparation of false and/or misleading press releases and SEC filings. King signed each of the ACS 1996-2005 Forms 10-K and 10-K405.

28.     Defendant Lynn Blodgett ("Blodgett") has been a Director and Executive Vice President and Chief Operating Officer of ACS since September 2005. From July 1999 until September 2005, he was Executive Vice President and Group President of Commercial Solutions of ACS. He caused or permitted the backdated stock options described herein to be granted. He has also personally benefited from the backdated stock options as described herein, including by receiving at least 75,000 backdated stock options. Because of defendant Blodgett's position, he knew non-public information about the business of ACS, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the relevant period, Blodgett participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

29.     Defendant Dennis McCuistion ("McCuistion") has been a Director of ACS since September 2003. As a member of the Board of Directors, defendant McCuistion knew non-public information about the business of ACS, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the relevant period, McCuistion participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. McCuistion signed the ACS 2003-2005 Forms 10-K.

30.    Defendant Warren Edwards ("Edwards") has been Executive Vice President and Chief Financial Officer of ACS since March 21, 2001. He caused or permitted the backdated stock options described herein to be granted. He has also personally benefited from the backdated stock options as described herein, including by receiving at least 30,000 backdated stock options. Moreover, because of his position, Edwards knew non-public information about the business of ACS, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the relevant period, Edwards participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Edwards signed the ACS 2003-2005 Forms 10-K.

31.    Defendant John Rexford ("Rexford") has been Executive Vice President of Corporate Development of ACS since March 2001. He has personally benefited from the backdated stock options as described herein, including by receiving at least 30,000 backdated stock options. He also caused or permitted the backdated stock options described herein to be granted. Moreover, because of his position, defendant Rexford knew non-public information about the business of ACS, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the relevant period, Rexford participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

32.    Defendant John M. Brophy ("Brophy") has been Executive Vice President of Business Relations of ACS since May 2005. From August 2001 until May 2005, he was Executive

Vice President and Group President of State and Local Solutions of ACS. He has personally benefited from the backdated stock options as described herein. Brophy knew non-public information about the business of ACS, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the relevant period, Brophy participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

## DUTIES OF ACS'S OFFICERS AND DIRECTORS

33.    By reason of their positions as ACS's directors and officers, and because of their ability to control the Company's business and affairs, defendants owed and owe ACS fiduciary duties of good faith, fair dealing and loyalty, and were and are required to use their utmost ability to control and manage ACS in a fair, just, honest and equitable manner. Defendants were and are required to act in furtherance of the best interests of ACS so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34.    Each director and officer of the Company owes to ACS the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as directors and/or officers of a public company, defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial performance and financial results so that the market price of the Company's stock would be based on truthful and accurate information. Defendants, because of their positions of control and authority as directors and/or officers of ACS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the

Company. Because of their senior positions with ACS, defendants, and each of them, had access to adverse nonpublic information about the unlawful stock option backdating practices and procedures described herein.

35.    At all relevant times, defendants, and each of them, were agents of the other defendants and of ACS, and were at all times acting within the course and scope of such agency.

36.    To discharge their duties, ACS's directors and officers were required to exercise good faith and reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of ACS were required to, among other things:

    (a)    prevent ACS's top executives from granting backdated stock options;

    (b)    prevent ACS's Compensation Committee from granting backdated stock options;

    (c)    refrain from acting upon material inside corporate information to benefit themselves;

    (d)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

    (e)    prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

    (f)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- 16 -

(g)    remain informed as to how ACS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the applicable federal and state corporation and/or securities laws; and

(h)    ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

## AIDING AND ABETTING AND CONCERTED ACTION

37.    In committing the wrongful acts particularized herein, defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct particularized herein as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective duties.

38.    At all relevant times, defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was overpaying its directors, officers and employees via backdated stock option grants; and (ii) maintain defendants' directorial and executive positions at ACS and the profits, power and prestige which defendants enjoyed as a result of these positions.

39.    Each of the defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein. In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

40.    ACS provides diversified business process outsourcing and information technology services and solutions to commercial and governmental clients worldwide. Between 1995 and 2005, ACS grew rapidly from a small technology firm into one with more than $4.4 billion in annual revenues. Based in Dallas, Texas, ACS has over 54,000 employees in Texas and elsewhere.

41.    Between 1995 and 2005, ACS, through the actions of its Board of Directors, Compensation Committee and Special Compensation Committee, granted stock options for the purchase of millions of shares of the Company's common stock to its top executives, including to many of the directors and senior ACS officers named as defendants herein.

42.    In its public filings, including in the ACS 1994 initial public offering prospectus and proxy statements containing shareholder-approved stock option plans, ACS represented that the exercise price of all of the incentive stock options would be not less than the fair market value of the price of ACS common stock, which the Company repeatedly stated is the stock's closing price on the date of the grant. *See, e g.,* 1994 Prospectus at 40; 1996 Proxy at 11; 1997 Proxy at 26-27. During the relevant period, stock options were granted by the Board of Directors through the Compensation Committee and/or Special Compensation Committee pursuant to the 1988 Stock Option Plan and the 1997 Stock Option Plan.[3]

43.    In connection with ACS's initial public offering of stock, certain defendants filed a Form S-1 Registration Statement with the SEC on September 27, 1994. ACS's Prospectus was incorporated in the Registration Statement. In the Prospectus, defendants stated:

   *Types of Grants.* Subject to adjustment, 1,850,000 of the Company's Class A Common Stock may be issued pursuant to grants under the Stock Option Plan. The

---

[3]    The 1988 Stock Option Plan was terminated during fiscal year 1998 in favor of the 1997 Stock Option Plan. *See* 1998 Form 10-K, Ex. 13.1 at 14.

Stock Option Plan provides for issuance of incentive stock options within the meaning of Section 422 of the Code ("Incentive Stock Options") . . . .

\*    \*    \*

*Options.* The exercise price of an Incentive Stock Option shall be no less than 100% of the fair market value of the Company's Class A Common Stock at the time of the grant . . . . Fair market value is determined by the Compensation Committee in accordance with the terms of the Stock Option Plan. After registration of the Company's Class A Common Stock pursuant to the Registration Statement of which this Prospectus is a part, fair market value will be determined by reference to the stock's closing price on the date of the grant.

1994 Prospectus at 40. Defendants Deason and Rich signed the Registration Statement.

44.    At all relevant times, the 1988 Stock Option Plan provided, in relevant part:

The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be the price as is determined by the Board, but shall be subject to the following:

(i)    In the case of an Incentive Stock Option

\*    \*    \*

(B)    granted to an Employee, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant.

1996 Proxy, Appendix 1 at 5.

45.    At all relevant times the 1988 Stock Option Plan defined "Fair Market Value" of ACS common stock "the closing sales price of such stock (or the closing bid, if no sales were reported, as quoted on such system or exchange for the last market trading day prior to the time of determination) as reported in the Wall Street Journal or such other source as the Administrator deems reliable." 1996 Proxy, Appendix 1 at 2.

46.    On or about September 30, 1996, the ACS Board of Directors, including defendants Deason, Rich, King, O'Neill and Rossi, recommended to shareholders that they approve amendments to the 1988 Stock Option Plan, including authorizing the granting of additional shares that could be awarded to executives. The Board told shareholders in the 1996 Proxy that "[t]he purpose of the Stock Option Plan is to provide the Company with an effective means to attract and

- 19 -

retain highly qualified personnel as well as to provide additional incentive to employees and others who provide services to the Company and who can contribute significantly to the Company's success." 1996 Proxy at 10.

47. On August 5, 1997, the ACS Board adopted the 1997 Stock Option Plan, subject to shareholder approval. The 1997 Stock Incentive Plan, provides, in pertinent part, as follows:

"FAIR MARKET VALUE" means, as of any date, the value of Common Stock determined as follows:

(i)    If the Common Stock is listed on any established stock exchange or a national market system including, without limitation, the New York Stock Exchange ("NYSE") its Fair Market Value shall be the closing sales price for such stock . . . as reported in the Wall Street Journal or such other source as the Administrator deems reliable.

*       *       *

The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be the price as is determined by the Board, but shall be subject to the following:

(i)    In the case of an Incentive Stock Option

*       *       *

(B)    granted to any other Employee, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant.

1997 Proxy, Appendix D at D-5 – D-6.

48. On or about November 14, 1997, the ACS Board, including defendants Deason, Rich, King, O'Neill and Rossi, recommended to shareholders that they approve the 1997 Stock Option Plan. In describing the 1997 Stock Option Plan, they expressly stated "the exercise price . . . shall be no less than 100% of the fair market value of ACS Class A Common Stock at the time of the grant," and that "the 1997 Plan reflects competitive practices and is necessary to attract and retain the best available personnel and promote the success of ACS's business and recommends its approval by the ACS stockholders." 1997 Proxy at 26-27.

49.     Contrary to the foregoing public disclosures, the options granted under these plans were highly favorable to the option recipients because the stock options were not granted at the "fair market value" on the date of grant but were in fact backdated. In many instances, the stock options were allegedly granted just before a sharp increase in the trading price of ACS stock or at the bottom of a steep drop in stock's price. In fact, according to ACS's spokeswoman Lesley Pool, stock option grants to ACS's executives were given "when there was a natural dip in the stock price." Defendant O'Neill, who served on ACS's Compensation Committee and Special Compensation Committee at relevant times, confirmed this practice, stating: "We had ups and downs in our stock price like any publicly traded stock. If there were perceived low points, would we grant options at that point? Yes."

50.     The practice of backdating options at ACS commenced prior to the passage of the Sarbanes-Oxley Act of 2002 ("Sarbanes"), when options grants did not have to be reported to the SEC until 45 days after the close of the fiscal year in which the options were granted. Defendants took advantage of the pre-Sarbanes rules to perpetrate their scheme. In most years, defendants Rich and Deason made recommendations to the Compensation Committee and Special Compensation Committee about stock option grants, and then a combination of defendants O'Neill, Rossi and Deason would authorize them as members of ACS's Compensation Committees. Hence, defendants retained unusual control over the grant dates and a procedure that increased the risk for backdating stock options granted to ACS's executives.

51.     Taking advantage of his executive position, defendant Rich received six grants between 1995 and 2002 at lows in the Company's stock price. For example:

(a)    ACS made one stock option grant to Rich in 1995, a grant of 444,100 options purportedly on March 9, 1995. On March 9, 1995, ACS stock closed at $5.63, near the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $5.09 to a high of $9.53 during 1995;



**Affiliated Computer Services**
**February 9, 1995 - April 10, 1995**

(b)     ACS made one stock option grant to Rich in 1996, a grant of 400,000 options purportedly on March 8, 1996. On March 8, 1996, ACS stock closed at $8.44, at the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $8.44 to a high of $15.88 during 1996;



- 23 -

(c)    ACS made one stock option grant to Rich in 1997, a grant of 120,000 options

purportedly on April 7, 1997. On April 7, 1997, ACS stock closed at $10.57, near the bottom of a

sharp dip in the price of ACS common stock, and preceding a sharp price increase. ACS stock

traded in a range from a low of $9.81 to a high of $15.00 in 1997;



- 24 -

(d)    ACS made one stock option grant to Rich in 1998, a grant of 500,000 options purportedly on October 8, 1998. On October 8, 1998, ACS stock closed at $11.53, at the bottom of a sharp dip in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $11.53 to a high of $22.50 during 1998;



**Affiliated Computer Services**

September 8, 1998 - November 9, 1998

(e)    ACS made one stock option grant to Rich in 2000, a grant of 200,000 options purportedly on July 11, 2000. On July 11, 2000, ACS stock closed at $16.44, near the bottom of a sharp dip in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $15.66 to a high of $30.75 during 2000; and



- 26 -

(f)    ACS made one stock option grant to Rich in 2002, a grant of 400,000 options purportedly on July 23, 2002. On July 23, 2002, ACS common stock closed at $35.75, near the bottom of a sharp dip in the price of ACS common stock, and preceding a sharp increase. ACS stock traded in a range from a low of $33.88 to a high of $56.75 during 2002.



52.    According to the *Wall Street Journal*, the statistical likelihood of the options granted to Rich from 1995 to 2002 occurring by chance on the dates when the prices of ACS stock was so low, and hence so favorable to Rich, would be *1 in 300 billion*:

> For instance, Affiliated Computers Services Inc. reported an option grant to its then-president, Jeffrey Rich, dated Oct. 8, 1998. In the succeeding 20 trading days – equal to roughly a month – ACS stock rose 60.2%. That huge gain was the best 20-trading-day performance all year for ACS. So the Journal ranked Oct. 8 No. 1 for ACS for 1998.

> It is very unlikely that several grants spread over a number of years would fall on high-ranked days.

- 27 -

But all six of Mr. Rich's did. Another of his option grants also fell on the No. 1-ranked day of a year, March 9, 1995. Two grants fell on the second-ranked day, those in 1996 and 1997. In 2002, his options grant was on the third-ranked day of the year, and in 2000, his grant came on the fourth-ranked day.

\*       \*       \*

For Mr. Rich's grants, the Journal's methodology puts the overall odds of a chance occurrence at about *one in 300 billion – less likely than flipping a coin 38 times and having it come up "heads" every time*.

53.    Other ACS directors and top officers also received improperly backdated stock option grants, including defendants Deason, Blodgett, King, Edwards, Rexford and Brophy. For example:

(a)    On April 7, 1997, ACS purportedly made a grant of 80,000 options to King. On April 7, 1997, ACS stock closed at $10.57, near the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $9.81 to a high of $15.00 during 1997;



**Affiliated Computer Services**

**March 7, 1997 - May 7, 1997**

- 28 -

(b)     On May 18, 1998, ACS purportedly made a grant of 40,000 options to King. On May 18, 1998, ACS stock closed at $15.94, at the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase.  ACS stock traded in a range from a low of $11.53 to a high of $22.50 during 1998;



- 29 -

(c)    On October 8, 1998, ACS purportedly made a grant of 100,000 options to King. On October 8, 1998, ACS stock closed at $11.53, at the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $11.53 to a high of $22.50 during 1998;



(d)    On September 13, 1999, ACS purportedly made a grant of 50,000 options to King. On September 13, 1999, ACS stock closed at $19.50, on unusually high trading volume and at the bottom of a sharp drop in the price of ACS common stock. ACS stock soon traded at $23 per share;



**Affiliated Computer Services**

**August 13, 1999 - October 13, 1999**

(e)    On July 11, 2000, ACS purportedly made a grant of 100,000 options to King, a grant of 30,000 options to Edwards, and a grant of 30,000 options to Rexford. On July 11, 2000, ACS stock closed at $16.44, near the bottom of a sharp dip in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $15.66 to a high of $30.75 during 2000;



- 32 -

(f)    On July 23, 2002, ACS purportedly made a grant of 600,000 options to Deason, a grant of 200,000 options to King, a grant of 75,000 options to Blodgett and a grant of 75,000 options to Brophy. On July 23, 2002, ACS stock closed at $35.75, near the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $33.88 to a high of $56.75 during 2002.



54.    As a result of the backdating of stock options issued to defendant Rich and ACS's other top insiders, defendants have been unjustly enriched at the expense of ACS, which has received and will receive less money from defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated. These windfall profits have made defendant Rich, as well as the other defendants, some of the highest paid executives in the business process outsourcing industry.

55.    Moreover, throughout the relevant period, defendants Blodgett, Deason, Edwards, King, O'Neill, Rexford, Rich and Rossi exercised many of these stock options permitting them to sell over $207 million worth of ACS stock they obtained.  The details of their stock sales are set forth in the chart below:

| Defendants | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| LYNN BLODGETT | 8/7/2000 | 120,000 | $23.00 | $2,760,000 |
| | 5/29/2001 | 20,000 | $35.50 | $710,000 |
| | 3/31/2003 | 5,000 | $45.00 | $225,000 |
| | 4/2/2003 | 75,000 | $45.27 | $3,395,250 |
| | 6/8/2004 | 70,000 | $50.12 | $3,508,400 |
| | 6/23/2004 | 30,000 | $52.00 | $1,560,000 |
| | 9/1/2004 | 60,000 | $55.00 | $3,300,000 |
| Total: | | 380,000 | | $15,458,650 |
| | | | | |
| DARWIN DEASON | 7/8/1998 | 41,200 | $19.25 | $793,100 |
| | 7/8/1998 | 8,800 | $19.31 | $169,928 |
| | 7/9/1998 | 1,039,750 | $19.00 | $19,755,250 |
| | 11/19/1998 | 6,800 | $19.06 | $129,608 |
| | 4/23/2003 | 18,000 | $50.00 | $900,000 |
| | 5/6/2003 | 182,000 | $50.00 | $9,100,000 |
| | 5/13/2003 | 20,000 | $52.36 | $1,047,200 |
| | 5/20/2003 | 5,000 | $50.00 | $250,000 |
| | 12/2/2003 | 800 | $53.43 | $42,744 |
| | 12/12/2003 | 10,000 | $53.15 | $531,500 |
| | 12/12/2003 | 8,000 | $53.10 | $424,800 |
| | 12/12/2003 | 7,000 | $53.00 | $371,000 |
| | 12/12/2003 | 5,000 | $53.06 | $265,300 |
| | 12/12/2003 | 5,000 | $53.12 | $265,600 |
| | 12/12/2003 | 5,000 | $53.17 | $265,850 |
| | 12/12/2003 | 5,000 | $53.27 | $266,350 |
| | 12/12/2003 | 5,000 | $53.35 | $266,750 |
| | 12/12/2003 | 4,000 | $53.11 | $212,440 |
| | 12/12/2003 | 2,000 | $53.08 | $106,160 |
| | 12/12/2003 | 200 | $53.45 | $10,690 |
| | 11/26/2004 | 144,100 | $60.01 | $8,647,441 |
| | 11/29/2004 | 25,000 | $60.00 | $1,500,000 |
| | 12/6/2004 | 17,000 | $60.00 | $1,020,000 |
| | 12/7/2004 | 419,200 | $60.18 | $25,227,456 |
| Total: | | 1,983,850 | | $71,569,167 |
| | | | | |
| WARREN EDWARDS | 5/21/2002 | 30,000 | $55.22 | $1,656,600 |
| | 5/21/2002 | 20,000 | $55.22 | $1,104,400 |
| | 5/19/2003 | 50,000 | $50.53 | $2,526,500 |
| | 9/13/2004 | 40,000 | $55.96 | $2,238,400 |
| | 9/14/2004 | 10,000 | $55.58 | $555,800 |
| Total: | | 150,000 | | $8,081,700 |
| | | | | |
| MARK KING | 4/30/2001 | 80,028 | $35.56 | $2,845,796 |
| | 5/21/2002 | 80,000 | $55.22 | $4,417,600 |

| Defendants | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 5/21/2002 | 2,000 | $54.70 | $109,400 |
| | 5/29/2002 | 2,000 | $55.20 | $110,400 |
| | 6/4/2002 | 2,000 | $53.76 | $107,520 |
| | 6/11/2002 | 2,000 | $54.94 | $109,880 |
| | 6/18/2002 | 2,000 | $54.08 | $108,160 |
| | 11/7/2002 | 26,000 | $50.00 | $1,300,000 |
| | 11/25/2002 | 16,000 | $50.00 | $800,000 |
| | 11/27/2002 | 4,000 | $50.00 | $200,000 |
| | 12/4/2002 | 200,050 | $50.00 | $10,002,500 |
| | 12/19/2002 | 4,000 | $50.00 | $200,000 |
| | 12/24/2002 | 2,000 | $50.95 | $101,900 |
| | 12/31/2002 | 2,000 | $52.45 | $104,900 |
| | 1/7/2003 | 2,000 | $55.55 | $111,100 |
| | 1/14/2003 | 2,000 | $54.80 | $109,600 |
| | 1/22/2003 | 2,000 | $51.91 | $103,820 |
| | 1/28/2003 | 2,000 | $51.80 | $103,600 |
| | 4/23/2003 | 3,000 | $50.00 | $150,000 |
| | 5/6/2003 | 25,000 | $50.00 | $1,250,000 |
| | 5/13/2003 | 2,000 | $52.55 | $105,100 |
| | 5/20/2003 | 1,000 | $50.00 | $50,000 |
| | 1/2/2004 | 10,300 | $55.20 | $568,560 |
| | 1/2/2004 | 4,900 | $55.40 | $271,460 |
| | 1/2/2004 | 4,600 | $55.15 | $253,690 |
| | 1/2/2004 | 3,000 | $55.00 | $165,000 |
| | 1/2/2004 | 3,000 | $55.03 | $165,090 |
| | 1/2/2004 | 100 | $55.25 | $5,525 |
| | 1/2/2004 | 100 | $55.47 | $5,547 |
| | 1/5/2004 | 10,000 | $56.00 | $560,000 |
| | 1/6/2004 | 2,000 | $56.82 | $113,640 |
| | 1/13/2004 | 2,000 | $56.50 | $113,000 |
| | 1/21/2004 | 2,000 | $55.41 | $110,820 |
| | 1/30/2004 | 2,000 | $55.10 | $110,200 |
| | 4/20/2004 | 5,000 | $55.00 | $275,000 |
| | 9/1/2004 | 800 | $54.76 | $43,808 |
| | 9/1/2004 | 600 | $54.76 | $32,856 |
| | 9/1/2004 | 600 | $54.75 | $32,850 |
| | 9/2/2004 | 24,000 | $54.82 | $1,315,680 |
| | 9/2/2004 | 6,000 | $54.75 | $328,500 |
| | 9/2/2004 | 2,700 | $54.75 | $147,825 |
| | 9/2/2004 | 1,300 | $54.76 | $71,188 |
| | 9/14/2004 | 2,000 | $55.75 | $111,500 |
| | 9/21/2004 | 2,000 | $57.07 | $114,140 |
| | 9/28/2004 | 2,000 | $54.75 | $109,500 |
| | 10/4/2004 | 50,000 | $60.08 | $3,004,000 |
| | 10/5/2004 | 2,000 | $60.14 | $120,280 |
| | 10/12/2004 | 2,000 | $57.85 | $115,700 |
| | 10/19/2004 | 2,000 | $57.12 | $114,240 |
| | 11/1/2004 | 2,000 | $54.75 | $109,500 |
| | 11/2/2004 | 2,000 | $54.95 | $109,900 |
| | 11/9/2004 | 2,000 | $57.81 | $115,620 |
| | 11/16/2004 | 2,000 | $59.18 | $118,360 |
| | 11/23/2004 | 2,000 | $59.31 | $118,620 |
| | 11/30/2004 | 2,000 | $59.32 | $118,640 |

| Defendants | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 12/7/2004 | 2,000 | $60.13 | $120,260 |
| | 12/14/2004 | 2,000 | $59.40 | $118,800 |
| | 12/21/2004 | 2,000 | $58.11 | $116,220 |
| | 12/28/2004 | 2,000 | $59.88 | $119,760 |
| | 1/4/2005 | 2,000 | $58.13 | $116,260 |
| | 1/11/2005 | 2,000 | $57.89 | $115,780 |
| | 1/19/2005 | 2,000 | $56.33 | $112,660 |
| Total: | | 636,078 | | $32,391,255 |
| | | | | |
| JOSEPH P. O'NEILL | 1/29/2001 | 20,000 | $32.00 | $640,000 |
| | 11/29/2002 | 40,000 | $50.08 | $2,003,200 |
| Total: | | 60,000 | | $2,643,200 |
| | | | | |
| JOHN REXFORD | 4/27/2001 | 4,000 | $35.50 | $142,000 |
| | 3/13/2002 | 75,000 | $52.15 | $3,911,250 |
| | 3/14/2002 | 10,000 | $54.00 | $540,000 |
| | 3/18/2002 | 7,500 | $54.90 | $411,750 |
| | 3/18/2002 | 7,500 | $55.11 | $413,325 |
| | 10/22/2003 | 10,000 | $48.20 | $482,000 |
| | 10/27/2003 | 40,000 | $48.50 | $1,940,000 |
| | 9/13/2004 | 70,000 | $56.00 | $3,920,000 |
| | 9/14/2004 | 30,000 | $55.71 | $1,671,300 |
| Total: | | 254,000 | | $13,431,625 |
| | | | | |
| JEFFREY RICH | 8/2/1996 | 50,000 | $13.93 | $696,500 |
| | 11/12/1998 | 10,000 | $19.22 | $192,200 |
| | 5/17/1999 | 12,000 | $19.97 | $239,640 |
| | 8/4/2000 | 90,000 | $24.26 | $2,183,400 |
| | 10/27/2000 | 71,200 | $27.92 | $1,987,904 |
| | 10/30/2000 | 28,800 | $27.52 | $792,576 |
| | 4/25/2001 | 25,800 | $34.67 | $894,486 |
| | 4/26/2001 | 74,200 | $34.68 | $2,573,256 |
| | 5/23/2001 | 100,000 | $35.81 | $3,581,000 |
| | 7/3/2001 | 4,000 | $36.20 | $144,800 |
| | 7/10/2001 | 4,000 | $36.15 | $144,600 |
| | 7/17/2001 | 4,000 | $38.00 | $152,000 |
| | 7/24/2001 | 4,000 | $39.65 | $158,600 |
| | 7/31/2001 | 4,000 | $42.75 | $171,000 |
| | 8/7/2001 | 4,000 | $39.16 | $156,640 |
| | 8/14/2001 | 4,000 | $40.85 | $163,400 |
| | 8/21/2001 | 4,000 | $41.18 | $164,720 |
| | 8/28/2001 | 4,000 | $43.01 | $172,040 |
| | 10/2/2001 | 4,000 | $39.55 | $158,200 |
| | 10/9/2001 | 4,000 | $43.70 | $174,800 |
| | 10/16/2001 | 4,000 | $44.40 | $177,600 |
| | 10/23/2001 | 4,000 | $46.15 | $184,600 |
| | 10/30/2001 | 4,000 | $44.75 | $179,000 |
| | 11/5/2001 | 100,000 | $46.15 | $4,615,000 |
| | 11/6/2001 | 4,000 | $46.40 | $185,600 |
| | 11/13/2001 | 4,000 | $45.75 | $183,000 |
| | 11/20/2001 | 4,000 | $48.00 | $192,000 |
| | 11/27/2001 | 4,000 | $47.60 | $190,400 |
| | 12/4/2001 | 4,000 | $47.00 | $188,000 |

| Defendants | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 12/11/2001 | 4,000 | $48.50 | $194,000 |
| | 12/18/2001 | 4,000 | $50.50 | $202,000 |
| | 12/26/2001 | 4,000 | $51.72 | $206,880 |
| | 1/2/2002 | 4,000 | $52.14 | $208,560 |
| | 1/8/2002 | 4,000 | $52.60 | $210,400 |
| | 1/16/2002 | 4,000 | $53.47 | $213,880 |
| | 1/22/2002 | 4,000 | $51.50 | $206,000 |
| | 1/29/2002 | 4,000 | $44.92 | $179,680 |
| | 2/5/2002 | 4,000 | $46.16 | $184,640 |
| | 2/12/2002 | 4,000 | $46.80 | $187,200 |
| | 2/19/2002 | 4,000 | $47.07 | $188,280 |
| | 2/26/2002 | 4,000 | $46.42 | $185,680 |
| | 3/5/2002 | 4,000 | $51.35 | $205,400 |
| | 3/12/2002 | 4,000 | $52.18 | $208,720 |
| | 3/19/2002 | 4,000 | $56.00 | $224,000 |
| | 3/26/2002 | 4,000 | $53.50 | $214,000 |
| | 4/2/2002 | 4,000 | $55.76 | $223,040 |
| | 4/9/2002 | 4,000 | $53.63 | $214,520 |
| | 4/16/2002 | 4,000 | $50.55 | $202,200 |
| | 4/23/2002 | 4,000 | $54.06 | $216,240 |
| | 4/30/2002 | 4,000 | $54.07 | $216,280 |
| | 5/7/2002 | 4,000 | $52.01 | $208,040 |
| | 5/14/2002 | 4,000 | $52.64 | $210,560 |
| | 5/21/2002 | 4,000 | $54.78 | $219,120 |
| | 5/28/2002 | 4,000 | $55.70 | $222,800 |
| | 6/4/2002 | 4,000 | $53.63 | $214,520 |
| | 6/11/2002 | 4,000 | $54.55 | $218,200 |
| | 6/18/2002 | 4,000 | $53.82 | $215,280 |
| | 6/25/2002 | 4,000 | $46.73 | $186,920 |
| | 7/3/2002 | 4,000 | $45.00 | $180,000 |
| | 7/9/2002 | 4,000 | $46.75 | $187,000 |
| | 7/17/2002 | 4,000 | $46.17 | $184,680 |
| | 7/30/2002 | 8,000 | $45.41 | $363,280 |
| | 8/6/2002 | 4,000 | $45.00 | $180,000 |
| | 8/13/2002 | 4,000 | $48.00 | $192,000 |
| | 8/20/2002 | 4,000 | $48.15 | $192,600 |
| | 8/27/2002 | 4,000 | $46.25 | $185,000 |
| | 9/4/2002 | 4,000 | $45.00 | $180,000 |
| | 9/10/2002 | 4,000 | $46.75 | $187,000 |
| | 9/17/2002 | 4,000 | $46.50 | $186,000 |
| | 10/3/2002 | 4,000 | $39.22 | $156,880 |
| | 10/21/2002 | 16,000 | $45.00 | $720,000 |
| | 10/22/2002 | 4,000 | $45.00 | $180,000 |
| | 10/22/2002 | 4,000 | $45.41 | $181,640 |
| | 10/29/2002 | 4,000 | $45.41 | $181,640 |
| | 11/5/2002 | 4,000 | $48.10 | $192,400 |
| | 11/12/2002 | 4,000 | $48.15 | $192,600 |
| | 11/20/2002 | 4,000 | $45.00 | $180,000 |
| | 11/26/2002 | 4,000 | $48.93 | $195,720 |
| | 12/10/2002 | 4,000 | $48.60 | $194,400 |
| | 12/24/2002 | 4,000 | $52.67 | $210,680 |
| | 12/31/2002 | 4,000 | $52.50 | $210,000 |
| | 1/7/2003 | 4,000 | $55.50 | $222,000 |

| Defendants | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
|  | 1/14/2003 | 4,000 | $54.85 | $219,400 |
|  | 1/21/2003 | 4,000 | $52.60 | $210,400 |
|  | 1/28/2003 | 4,000 | $50.46 | $201,840 |
|  | 2/4/2003 | 4,000 | $50.00 | $200,000 |
|  | 2/11/2003 | 4,000 | $46.10 | $184,400 |
|  | 2/19/2003 | 2,000 | $47.75 | $95,500 |
|  | 2/25/2003 | 2,000 | $45.00 | $90,000 |
|  | 3/4/2003 | 2,000 | $45.10 | $90,200 |
|  | 3/11/2003 | 2,000 | $41.75 | $83,500 |
|  | 3/18/2003 | 2,000 | $46.35 | $92,700 |
|  | 3/19/2003 | 2,000 | $46.35 | $92,700 |
|  | 3/25/2003 | 2,000 | $46.73 | $93,460 |
|  | 4/1/2003 | 2,000 | $44.26 | $88,520 |
|  | 4/8/2003 | 2,000 | $41.95 | $83,900 |
|  | 4/15/2003 | 2,000 | $42.80 | $85,600 |
|  | 4/15/2003 | 2,000 | $42.80 | $85,600 |
|  | 4/15/2003 | 2,000 | $42.80 | $85,600 |
|  | 4/22/2003 | 2,000 | $46.10 | $92,200 |
|  | 4/29/2003 | 2,000 | $48.20 | $96,400 |
|  | 5/6/2003 | 2,000 | $49.35 | $98,700 |
|  | 5/13/2003 | 2,000 | $52.54 | $105,080 |
|  | 5/20/2003 | 2,000 | $49.90 | $99,800 |
|  | 5/28/2003 | 2,000 | $47.00 | $94,000 |
|  | 6/3/2003 | 2,000 | $48.45 | $96,900 |
|  | 6/10/2003 | 2,000 | $46.70 | $93,400 |
|  | 6/17/2003 | 2,000 | $48.10 | $96,200 |
|  | 6/24/2003 | 2,000 | $45.75 | $91,500 |
|  | 12/15/2003 | 48,100 | $53.24 | $2,560,844 |
|  | 4/30/2004 | 150,000 | $48.49 | $7,273,500 |
|  | 5/25/2004 | 32,000 | $50.00 | $1,600,000 |
|  | 5/26/2004 | 12,300 | $50.00 | $615,000 |
|  | 6/4/2004 | 4,000 | $50.00 | $200,000 |
|  | 6/7/2004 | 51,700 | $50.05 | $2,587,585 |
|  | 9/9/2004 | 100,000 | $55.02 | $5,502,000 |
|  | 12/14/2005 | 88,042 | $55.14 | $4,854,636 |
|  | 12/14/2005 | 992 | $55.14 | $54,699 |
| Total: |  | 1,417,134 |  | $60,515,286 |
|  |  |  |  |  |
| FRANK A. ROSSI | 8/29/2001 | 10,000 | $42.50 | $425,000 |
|  | 1/24/2003 | 25,000 | $51.41 | $1,285,250 |
|  | 1/21/2004 | 25,000 | $55.32 | $1,383,000 |
| Total: |  | 60,000 |  | $3,093,250 |
|  |  |  |  |  |
| Grand Total: |  | 4,304,984 |  | 207,184,132 |

56.    The practice of backdating stock options not only lines the pockets of ACS's directors and executives at the direct expense of the Company, which receives money dollar for dollar when the options are exercised, but also has caused the Company to take a $40 million charge because it

improperly accounted for its option grants subsequent to its initial public offering in 1994 through

December 31, 2005. This is because options priced below the stock's fair market value when they

are awarded bring the recipient an instant paper gain. Under accounting rule APB No. 25, which the

ACS Board said the Company followed between at least 1995-2005, that is the equivalent of

additional compensation and thus must be treated as a cost to the Company. ACS did not account as

an expense the amount by which the market price of the Company's stock on the actual date the

options were issued exceeded the exercise price of the options and thus the defendants' conduct

described herein caused ACS to materially understate defendants' compensation expenses and

materially overstate its publicly reported net income and earnings per share.

57.    The ACS Performance-Based Incentive Compensation Program for ACS's executive

officers was effective at all relevant times, including 1995-2002. From 1996-2002, the program

provided, in pertinent part:

> Executive Officers will be entitled to receive varying ranges of up to 250% of their
> base salaries upon achievement of bonus performance goals which include the
> Company's achievement of four targeted financial measures: consolidated revenues,
> consolidated earnings before interest, taxes and depreciation, consolidated pre-tax
> earnings and consolidated earnings per share. The bonus performance goals have
> been pre-established by the Compensation Committee [Deason, O'Neill and Rossi]
> for all executive officers other than any executive officer whose compensation may
> exceed $1 million, which other officer's goals have been previously established by
> the Special Compensation Committee . . . .

1996 Proxy at 16. The performance goals established by the Compensation Committee and Special

Compensation Committee were met every year from 1996-2002. As a result, defendants Deason,

Rich and King received large cash bonuses that were equal to or greatly exceeded their annual

salaries[4]:

---

[4]    In 1998 and 2000 Deason received bonus compensation (256% and 260%, respectively)
above the threshold approved by shareholders.

| Defendant | Year | Salary | Bonus | Bonus % of Cash Compensation |
|---|---|---|---|---|
| Deason | 1996 | $450,000 | $807,836 | 180% |
|  | 1997 | $450,000 | $1,125,000 | 250% |
|  | 1998 | $487,512 | $1,250,000 | 256% |
|  | 1999 | $525,000 | $1,312,500 | 250% |
|  | 2000 | $525,000 | $1,367,500 | 260% |
|  | 2001 | $574,295 | $1,435,750 | 250% |
|  | 2002 | $608,749 | $1,521,895 | 250% |
| Rich | 1996 | $222,385 | $437,500 | 196% |
|  | 1997 | $274,995 | $550,000 | 200% |
|  | 1998 | $312,504 | $650,000 | 208% |
|  | 1999 | $425,000 | $850,000 | 200% |
|  | 2000 | $425,000 | $885,700 | 209% |
|  | 2001 | $500,000 | $1,000,000 | 200% |
|  | 2002 | $525,000 | $1,050,000 | 200% |
| King | 1996 | $125,000 | $125,000 | 100% |
|  | 1997 | $175,000 | $218,750 | 125% |
|  | 1998 | $212,500 | $337,500 | 159% |
|  | 1999 | $275,000 | $412,500 | 168% |
|  | 2000 | $275,000 | $429,825 | 156% |
|  | 2001 | $333,333 | $600,000 | 180% |
|  | 2002 | $400,000 | $700,000 | 175% |

Under the terms of the Performance-Based Incentive Compensation Program, the bonus performance goals were based in large part on measures of ACS's financial performance (consolidated earnings before interest, taxes and depreciation, consolidated pre-tax earnings and consolidated earnings per share) that would have been adversely affected by proper accounting for the millions of backdated stock options awarded to defendants in 1996-2002; proper accounting for millions of backdated stock options held here resulted in lower consolidated earnings before interest, taxes and depreciation, consolidated pre-tax earnings and consolidated earnings per share.

58.    Defendants, who were and/or are directors and/or officers of ACS, with a fiduciary duty to act with the utmost good faith and loyalty, either expressly authorized the practice of backdating stock options or, in conscious disregard of their fiduciary duties, made no effort to seek recompense to the Company. Moreover, defendants Deason, Kosberg, Rossi and O'Neill served on

- 40 -

the Compensation Committee and/or Special Compensation Committee of the ACS Board of

Directors at certain times. The Compensation Committees were responsible for overseeing the

details of ACS's compensation, employee benefits and stock options plans. The Compensation

Committees were also responsible for administering and reviewing ACS's executive compensation

and incentive compensation programs. Defendants Deason, Kosberg, Rossi and O'Neill, in violation

of their duties as members of the Compensation Committees, gave undeserved compensation to

defendants Rich, Deason, King and others rather than remaining truly independent and completely

unbiased.

59.    The practice of backdating stock option grants to certain ACS's directors and top

executives remained undisclosed until March 18, 2006, when the *Wall Street Journal* published an

analysis of stock options granted to defendant Rich. With regard to the option backdating scheme at

ACS, the *Wall Street Journal* stated, in pertinent part, as follows:

> On a summer day in 2002, shares of Affiliated Computer Services Inc. sank
> to their lowest level in a year. Oddly, that was good news for Chief Executive
> Jeffrey Rich.
>
> His annual grant of stock options was dated that day, entitling him to buy
> stock at that price for years. Had they been dated a week later, when the stock was
> 27% higher, they'd have been far less rewarding. It was the same through much of
> Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1995
> to 2002 were dated just before a rise in the stock price, often at the bottom of a steep
> drop.
>
> Just lucky? *A Wall Street Journal analysis suggests the odds of this
> happening by chance are extraordinarily remote – around one in 300 billion*. The
> odds of winning the multistate Powerball lottery with a $1 ticket are one in 146
> million.
>
> Suspecting such patterns aren't due to chance, the Securities and Exchange
> Commission is examining whether some option grants carry favorable grant dates for
> a different reason: They were backdated. The SEC is understood to be looking at
> about a dozen companies' option grants with this in mind.
>
> *            *            *
>
> *Mr. Rich called his repeated favorable option-grant dates at ACS "blind
> luck." He said there was no backdating, a practice he termed "absolutely wrong".*

A spokeswoman for ACS, Lesley Pool, disputed the Journal's analysis of the likelihood of Mr. Rich's grants all falling on such favorable dates. But Ms. Pool added that the timing wasn't purely happenstance: "We did grant options when there was a natural dip in the stock price," she said. On March 6, ACS said that the SEC is examining its option grants.

*    *    *

While most of Mr. Rich's stock-option gains were due to rises in ACS stock, the exceptional timing of grants enhanced his take. If his grants from 1995 through 2002 had come at each year's average share price, rather than the favorable dates, he'd have made about 15% less.

An especially well-timed grant, in which Mr. Rich received 500,000 options at $11.53, adjusted for stock splits, was dated Oct. 8, 1998. This happened to be the bottom of a steep plunge in the price. The shares fell 28% in the 20 trading days prior to Oct. 8, and rose 60% in the succeeding 20 trading days.

ACS's Ms. Pool said the grant was for Mr. Rich's promotion to CEO. He wasn't promoted until February 1999. Ms. Pool said there was a "six-month transition plan," and the Oct. 8 option grant was "in anticipation" of his promotion.

Mr. Rich would have fared far worse had his grant come on the day ACS announced his promotion. The stock by then was more than twice as high. The grant wasn't reported to the SEC until 10 months after the stated grant date. Ms. Pool said that was proper under regulations in place at the time.

A special board committee oversaw Mr. Rich's grants. Most years, its sole members were directors Frank Rossi and Joseph O'Neill. Mr. Rossi declined to comment. Mr. O'Neill said, "We had ups and downs in our stock price like any publicly traded stock. If there were perceived low points, would we grant options at that point? Yes."

Mr. Rich said grants were made on the day the compensation committee authorized them, or within a day or so of that. He said he or Chairman Darwin Deason made recommendations to the special board committee about option dates.

60.    The *Wall Street Journal* further revealed the proceeds reaped by defendant Rich on

his well-timed resignation:

Mr. Rich, who is 45 years old, resigned abruptly as ACS's chief executive on a Thursday in September to "pursue other business interests." Again, his timing was advantageous. *In an unusual separation agreement, the company agreed to make a special payment of $18.4 million, which was equal to the difference between the exercise price of 610,000 of his outstanding stock options and the closing ACS stock price on the day of his resignation.*

- 42 -

But the company didn't announce the resignation that day. On the news the next Monday that its CEO was departing suddenly, the stock fell 6%. ***Mr. Rich netted an extra $2 million by cashing in the options before the announcement, rather than on the day of it.***

Mr. Rich said ACS signed his separation agreement on Friday, using Thursday's price for the options payout. He said it waited till Monday to release the news because it didn't want to seem "evasive" by putting the news out late Friday.

61.     On April 27, 2006, defendants hosted a conference call with ACS shareholders and

analysts. With regard to the recent news concerning the alleged backdating scheme at ACS,

defendant King, President & CEO of ACS, stated, in pertinent part, as follows:

Our Compensation Committee has not been opposed to granting stock options when our stock price appeared low relative to its trading history, and in some cases grants have been made when natural dips have occurred in our stock price. The Compensation Committee recognizes that meaningful incentives granted through stock options to key executives is critical to building the overall long-term market value of ACS.

\*       \*       \*

Our internal investigation is not complete; but based on the information we have gathered and what we know at this point, I offer the following: First, we do not believe that there has been any intentional granting of look-back stock options to executive officers and directors, and we believe our grants have complied with the terms of our stock options plan. Of course, this matter is subject to resolution of the SEC investigation, as well as our ongoing internal investigation. And second, as we have previously said, we do not believe the allegations in the shareholder lawsuit have merit, and we intend to vigorously defend the case.

62.     On May 10, 2006, defendants announced that ACS would be delaying the filing of its

1stQ 06 financial results with the SEC. Contrary to previous reports, defendants now admitted that

certain of their options were dated prior to when they became effective. As a result, defendants

announced that ACS would take a $40 million charge for compensation expenses that were not

properly accounted for in prior periods. Incredibly, in the same breath, defendants sought to

downplay the emerging wrongdoing. Defendants' release admitting material facts, yet

simultaneously backtracking, stated, in pertinent part:

At the direction of the Company's Board of Directors, in response to the informal SEC investigation noted above, ACS has commenced an internal

- 43 -

investigation through its regular outside counsel into the Company's historical stock option practices, including a review of the Company's underlying option grant documentation and procedures. Due to the volume of data subject to this review, the Company is unable to complete and file by the prescribed due date its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2006 without unreasonable effort or expense.

\*       \*       \*

*Historically, the Company has granted stock options principally utilizing a process whereby its compensation committee or special compensation committee, as applicable, would approve stock option grants through unanimous written consents with specified effective dates that generally preceded the date on which the consents had been executed by all members of the applicable compensation committee.* In connection with option grants to senior executives, the historical practice was for the Company's chairman, who during periods prior to September 2003 was also a member of the Company's compensation committee, to engage, on a relatively contemporaneous basis with the effective date specified in the written consent, in individual telephonic discussions with each of the members of the applicable compensation committee, during which the committee member would indicate his approval of the option grants in question. In connection with significant acquisitions, the Company's historical practice was for its Board of Directors (including members of the applicable compensation committee) to consider during board meetings convened for the purpose of approving an acquisition the proposed stock option component that would be designated to an acquisition target's management team, with a unanimous written consent of the applicable compensation committee to follow at a later time with a specified effective date for the option grants in question.

Based on its option grant procedures, the Company has historically considered the effective date specified in the written consents by the applicable compensation committee as the accounting measurement date for determining stock-based compensation expense under APB 25 and SFAS 123®. However, the Company has determined, in consultation with its independent public accounting firm, that the proper accounting measurement date for stock option awards cannot precede the date on which the grants were approved through the execution of written consents or through a valid meeting of the applicable compensation committee. *Notwithstanding the Company's accounting determination noted above*, the Company believes that (i) its historical written consent effective date process is permitted under the Company's current and predecessor stock option plans and Delaware corporate law, (ii) the Company has consistently followed this process in prior accounting periods, and (iii) in many cases, the grants in question had been verbally discussed and approved by each of the members of the applicable compensation committee on a relatively contemporaneous basis with the specified effective date of those grants.

Accordingly, based on the preliminary results of its review of the Company's historical stock option practices, including its underlying option grant documentation and procedures, and the initial findings of its internal investigation (which is on-

- 44 -

going and not complete as of the date of this filing), ***the Company has preliminarily determined that it will record a cumulative prior period non-cash stock-based compensation expense charge in an amount that is not presently anticipated to exceed approximately $40 million. This charge relates to certain of the option grants covering approximately 24 million common shares (after giving effect to forfeitures of option grants covering approximately 7 million common shares) by the Company subsequent to its initial public offering in 1994 and through December 31, 2005.***

63.     Then, on May 17, 2006, the Company received a grand jury document subpoena issued by the U.S. District Court for the Southern District of New York requesting that the Company produce documents relating to the granting of stock options from 1998 through the present.

64.     On August 7, 2006, defendants ***retracted*** its May 10, 2006 statement, effectively abandoning their claims that stock options were not backdated, stating that "previously disclosed preliminary findings regarding" suspected options malfeasance "can no longer be relied upon" because the Company's prior statements would be "superseded by" ACS's disclosure of the result of an internal investigation in September 2006.

65.     Defendants then refused to discuss stock options backdating, the internal investigation or any related topics on its August 9, 2006 quarterly conference call with shareholders and analysts.

66.     On September 14, 2005, defendants disclosed that ACS's 2006 report on Form 10-K will be delayed due to the stock option investigation. They also provided detail on the purportedly "independent" investigation being conducted by the Company. The release stated, in pertinent part:

> As previously disclosed, beginning in March 2006 ACS' internal investigation was conducted, at the direction of the Board of Directors, by the Company's regular outside counsel, which had not been involved in the Company's historical stock option grant process. ACS' regular outside counsel also represented the Company in connection with the SEC informal inquiry which began in March 2006. In May 2006 the Company retained independent counsel, Bracewell & Giuliani LLP ("Investigation Counsel"), to jointly conduct the internal investigation with the Company's regular outside counsel and to represent the Company in connection with the investigations being conducted by the United States Attorney and the SEC. Further, in July 2006 the ACS Board's Audit Committee, consisting of all four of the Company's independent directors, retained its own independent counsel to assist the Audit Committee in monitoring the internal investigation.

In August 2006 the Company's Board of Directors voted to instruct Investigation Counsel to report the progress and findings of the internal investigation to the Board's independent directors and the Audit Committee and to change the role of its regular outside counsel to one of providing ongoing assistance to Investigation Counsel. In addition, the Company retained Skadden, Arps, Slate, Meagher & Flom LLP in August 2006 as its new regular outside corporate counsel. Subsequently, an Ad Hoc Committee of the Board of Directors, consisting of all the Company's independent directors, was formally established to monitor, oversee and direct the conduct of the internal investigation.

During the past week the Ad Hoc Committee received oral updates on the progress of the investigation from Investigation Counsel. The investigation into the Company's historic stock option grant practices is continuing and the investigation also includes a review of the preparation of the Company's Form 10-Q for the quarterly period ended March 31, 2006, as filed with the SEC on May 15, 2006. On August 7, 2006 the Company announced that previously disclosed preliminary findings of the investigation set forth in Note 3 to its consolidated financial statements included in its Form 10-Q should no longer be relied upon. The Ad Hoc Committee will make recommendations to the Board of Directors when it receives the final report of Investigation Counsel.

The Company's Audit Committee, which consists of the same individuals as the Ad Hoc Committee, has received periodic reports from Investigation Counsel. In addition, the Audit Committee does not expect the independent auditors to be in a position to complete the audit of the Company's financial statements until the internal investigation is complete and the independent auditors have had the opportunity to review the findings and any recommendations, including any actions recommended by the Ad Hoc Committee, Audit Committee and Board of Directors.

In view of the foregoing, the Company is not in a position to file its Annual Report on Form 10-K for its fiscal year ended June 30, 2006, as required to be filed by yesterday's close of business. While the Company is seeking to be in a position to file its Form 10-K by September 28, 2006, which is within the additional time period permitted under the SEC rules for an issuer to be deemed to have filed in a timely manner, there is no assurance that the Form 10-K will be filed by such date.

Absent a waiver, the Company may face covenant compliance issues under its March 2006 Credit Facility, including if it does not have audited financial statements within 90 days of the end of its fiscal year. The Company is in the process of seeking a waiver from the lenders under the Credit Facility. Approximately $2.0 billion in borrowings are outstanding under the Credit Facility.

67.     As ACS's directors and/or top officers, defendants stood in a fiduciary relationship with the Company's shareholders, and had a duty to disclose their practice of backdating stock options for certain ACS executives. In violation of that duty, defendants unlawfully concealed the

fact that the options granted to defendants Rich, Deason and others, were backdated and made affirmative misrepresentations to the contrary.

68.     Defendants misrepresented and caused the Company to misrepresent in public SEC filings that the stock options were priced at not less than the fair market value of the stock on the date of grant, thereby affirmatively concealing the claims set forth herein.  The shareholder-approved stock option plans were exhibits that were incorporated by reference each year in ACS's SEC annual reports, which oftentimes defendants personally signed under penalty of perjury.  Defendants' misrepresentations about their stock option pricing practices were known to be false and were made in reckless disregard of their truth or falsity, and the concealment could not have been discovered through reasonable diligence by the typical shareholder.

## ACS'S FALSE AND MISLEADING SEC FILINGS

**ACS'S False and Misleading
Registration Statement and Prospectus**

69.     In connection with ACS's initial public offering of stock, ACS filed a Form S-1 Registration Statement with the SEC on September 26, 1994.  ACS's Prospectus was incorporated in the Registration Statement.  Defendants Deason and Rich signed the Registration Statement.

70.     The Form S-1 Registration Statement and Prospectus were materially false and misleading due to misrepresentations made by defendants regarding ACS's stock options practices. In particular, defendants stated:

> The exercise price of an Incentive Stock Option shall be no less than 100% of the fair market value of the Company's Class A Common Stock at the time of the grant . . . . Fair market value is determined by the Compensation Committee in accordance with the terms of the Stock Option Plan.  After registration of the Company's Class A Common Stock pursuant to the Registration Statement of which this Prospectus is a part, fair market value will be determined by reference to the stock's closing price on the date of the grant.

1994 Prospectus at 40.

- 47 -

**ACS's False and Misleading 1996-2005 Forms 10-K405 and 10-K**

71.    ACS's financial results for the fiscal fourth quarter and years ended 1996-2005, including the periods ending June 30, 1996-2005, were reported in the Company's Reports on Form 10-K405 and 10-K filed with the SEC. Each Form 10-K405 and 10-K was simultaneously distributed to shareholders. Defendants Deason, Rich, King, O'Neill and Rossi signed each of the 1996-2005 ACS Forms 10-K405 or 10-K for the respective fiscal year. Defendants Deason, Rich, King, O'Neill, Rossi and Edwards signed the 2001 and 2002 ACS Forms 10-K for the respective fiscal year. Defendants Deason, Rich, King, O'Neill, Rossi, Edwards, Kosberg and McCuistion signed the 2003-2005 ACS Forms 10-K for the respective fiscal year.

72.    The 1996-2005 Forms 10-K405 and 10-K included ACS's 1996-2005 financial statements and notes thereto, which were materially false and misleading and presented in violation of U.S. Generally Accepted Accounting Principles ("GAAP"), due to improper accounting for the backdated stock options. At all relevant times, defendants represented that ACS accounted for stock options using the intrinsic method described in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"). *See, e.g.*, 1999 Form 10-K, Ex. 13.1 at 20 ("[T]he company has elected to adopt the disclosure-only provisions of SFAS 123 and will continue to account for stock-based employee compensation plans in accordance with APB 25."); 2002 Form 10-K at 44 ("[W]e have elected to adopt the disclosure-only provisions of SFAS 123 and will continue to account for stock-based employee compensation plans in accordance with APB 25.").

73.    Under APB 25, ACS was required to record as an expense on its financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is "in-the-money" on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the

vesting period of the option. Options that are at-the-money or underwater on the measurement date need not be expensed.

**ACS's False and Misleading Proxy Statements**

74.     Defendants caused ACS to send shareholders a proxy statement in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the period 1995 through 2006. Each defendant prepared and/or reviewed proxy statements between 1995 and 2006 before the statements were sent to shareholders and filed with the SEC. Defendants Deason, Rich, King, O'Neill and Rossi prepared and/or reviewed every proxy statement between 1995 and 2006. Defendants knew, or were deliberately reckless in not knowing, that the proxy statements were materially false and misleading.

75.     The ACS proxy statements that were sent to shareholders by defendants annually in connection with annual shareholders' meeting typically concerned the election of directors, the approval and adoption of ACS's stock option plan and authorization to reserve shares for future issuance under the stock option plans, approval of the ACS Performance-Based Incentive Compensation program for executive officers, and ratification of the selection of ACS's auditor. Each proxy statement sent to shareholders during this period contained materially false and misleading disclosures or omitted information about ACS's stock option practices and violations of the terms of the 1988 and 1997 Stock Option Plans, including, among other things, that (i) stock options were priced at fair market value on the date of the grant; and (ii) ACS followed and adhered to APB 25.

76.     The proxy statements at issue are the following:

| Date of Letter to Shareholders | Shareholder Meeting Date |
|---|---|
| 10/16/95 | 11/7/95 |
| 9/30/96 | 10/28/96 |
| 11/14/97 | 12/16/97 |
| 10/28/98 | 11/27/98 |

| Date of Letter to Shareholders | Shareholder Meeting Date |
|---|---|
| 9/28/99 | 10/26/99 |
| 9/28/00 | 10/26/00 |
| 9/28/01 | 10/25/01 |
| 9/24/02 | 10/24/02 |
| 9/29/03 | 10/30/03 |
| 9/27/04 | 10/28/04 |
| 9/30/05 | 10/27/05 |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

77.    Plaintiffs incorporate ¶¶1-76.

78.    Plaintiffs will adequately and fairly represent the interests of ACS in enforcing and prosecuting its rights.

79.    The Board of Directors of ACS consists of the following defendants: Deason, King, Blodgett, Kosberg, McCuistion, O'Neill, and Rossi. All of the Board members either authorized and approved the backdating stock option grants at issue here or should have known of the backdating stock option grants. Plaintiffs did not make a demand on the Board of ACS to bring this action on behalf of the Company because such a demand would have been a useless and futile act and, therefore, is excused, for the following reasons:

(a)    There was no basis or justification for backdating stock options. It was designed solely to benefit certain of the defendants in a manner that was inconsistent with their fiduciary duties of good faith, fair dealing and loyalty to ACS, and the Company's public disclosures, to the detriment of ACS. Consequently, the transaction constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by defendants;

(b)    Between 1995 and 2002, defendants Deason, King and Blodgett were recipients of the stock options, which plaintiffs allege were backdated. Because Deason, King and

- 50 -

Blodgett received a personal financial benefit from the challenged transaction, they are interested in the outcome of this litigation, and therefore, a demand upon them is futile (*see* ¶55);

(c)     The internal investigation into stock option pricing at ACS is being directed by the ACS Board of Directors and overseen by the "Ad Hoc Committee" of the Board of Directors, which consists entirely of interested directors. Five of the seven members of the Board of Directors either received backdated stock options (Deason, King and Blodgett) or were members of the ACS Compensation Committee (Deason, O'Neill and Rossi) and/or Special Compensation Committee (O'Neill and Rossi), which were responsible for administering and managing ACS's executive compensation program and stock option plans at the time that the Company issued backdated stock options. O'Neill and Rossi are also two of the four members of the Audit Committee, and Rossi is the Chair of the Audit Committee. The four members of the Audit Committee, including O'Neill and Rossi, also comprise the "Ad Hoc Committee" overseeing the options backdating investigation. Thus, the ACS internal investigation into illegal stock option practices is being directed by a Board of which a majority participated in or benefited from the wrongdoing and conducted by a committee of which half the members participated in the wrongdoing;

(d)     As members of the Compensation Committee and/or Special Compensation Committee, defendants Deason, O'Neill and Rossi were responsible for administering and managing ACS's executive compensation program and stock option plans at relevant times. During the relevant time period, ACS's Compensation Committee and/or Special Compensation Committee "approve[d] the individuals eligible to receive grants of options under the [1997] Stock Option Plan, the type of option granted, the number of shares of Class A common stock subject to a grant and the terms of the grant, including exercise price, exercise date and any restrictions on exercise." 2002 Proxy at 15; *see also* 1997 Proxy at 89 ("The Compensation Committee and the Special Compensation Committee have determined the individuals eligible to receive grants of options under

- 51 -

the 1988 Stock Option Plan, the type of option granted, the number of shares of Class A Common Stock subject to a grant and the terms of the grant, including exercise price, exercise date, and any restrictions on exercise."). O'Neill has admitted that ACS purposefully priced options when it perceived ACS stock to be trading at low prices;

(e)    As members of the Compensation Committee, Deason, O'Neill and Rossi, at various times, authorized and enabled, or through conscious disregard, permitted, ACS to backdate stock options issued to defendants Rich, King and other ACS top executives. As members of the Special Compensation Committee, defendants O'Neill and Rossi, at various times, authorized or enabled, or through conscious disregard, permitted, ACS to backdate stock options issued to defendant Deason and others. By such actions, defendants Deason, O'Neill and Rossi breached their fiduciary duties of good faith, fair dealing and loyalty to ACS. The backdating of stock options was in direct violation of the stock option plans. The practice has been described by defendant Rich himself as "absolutely wrong." Based upon the foregoing, it is doubtful that the backdating of options was the product of defendants Deason, O'Neill and Rossi's proper exercise of business judgment and therefore demand is futile and excused;

(f)    The members of ACS's Audit Committee, which is purportedly overseeing outside counsel in its investigation of the Company's internal investigation into stock options pricing is composed of defendants O'Neill, Rossi, Kosberg and McCuistion. Rossi is the Chairman of the Audit Committee. By virtue of their membership on the Compensation Committees that were responsible for administering and managing ACS executive compensation and the stock option program, O'Neill and Rossi, at various times, authorized and enabled, or through conscious disregard permitted, ACS to backdate stock options. Based upon the foregoing, it is doubtful that the backdating of options was the product of defendants Deason, O'Neill and Rossi's proper exercise of business judgment in their oversight of outside counsel's investigation; and

(g)    The members of ACS's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action. For example:

(i)    Defendant Kosberg is the former Chairman of a collapsed savings and loan in which Deason had a significant interest;

(ii)    Kosberg was a board member of Precept Business Services ("Precept"), an ACS spin-off corporation in which Deason was the controlling shareholder. Kosberg served on the Precept audit and compensation committees. Precept filed for bankruptcy in 2001 and the bankruptcy trustee criticized Precept directors for allowing Deason and his relatives to "systematically loot" Precept. A subsequent lawsuit in federal bankruptcy court by the trustee criticized Kosberg and alleged that the publicly-held company directed by Deason improperly paid personal expenses for Deason and his family, including for country-club memberships, luxury cars, cosmetic surgery, maid services, bodyguards, dry cleaning and limousine services. Deason and Kosberg settled the case and Deason paid $3 million; and

(iii)    ACS invested $25,000 in a partnership created by McCuistion to produce a television show and Deason later served on the board of directors of a nonprofit television company started by McCuistion. McCuistion was also formerly a consultant for a company owned by Deason.

80.    Defendants authorized the filing of proxy statements, in support of their nomination as directors, which failed to disclose that the defendants' stock option grants had been backdated.

- 53 -

They also recommended to shareholders that they authorize the grant of additional shares pursuant to the 1988 Stock Option Plan and authorize the 1997 Stock Option Plan.

81.     Defendants Deason, Rich, Blodgett and King received millions of backdated stock options from ACS pursuant to the 1988 and 1997 Stock Option Plans. At certain relevant times, including from 1996-2002, defendants Deason, O'Neill and Rossi administered the plans on behalf of the Board of Directors as members of the Compensation Committee and/or Special Compensation Committee of the Board of Directors. Defendants Deason, Rich, King, O'Neill, Rossi and the other members of the ACS Board of Directors recommended to shareholders in the ACS 1996 and 1997 Proxy Statements that they approve the authorization of additional stock option grants pursuant to the 1988 Stock Option Plan in 1996 and further recommended to shareholders they approve the 1997 Stock Option Plan. Defendants did not disclose in the 1996 and 1997 Proxy Statements, or at any other time, that stock options had been, were being and would continue to be backdated in violation of the terms of the 1988 Stock Option Plan and the 1997 Stock Option Plan.

(a)     On or about September 30, 1996, defendants Deason, Rich, King, O'Neill and Rossi urged shareholders to approve two amendments to the 1988 Stock Option Plan. The amendment purportedly had two purposes: (i) to bring the 1988 Stock Option Plan into compliance with §162(m) of the Internal Revenue Code "so that the compensation expense resulting from the grants of stock options under the Stock Option Plan to certain executive officers whose compensation exceeds $1 million may be deductible by the Company for federal income tax purposes"; and (ii) "to increase the number of shares of the Company's Class A Common Stock reserved for issuance under the Stock Option Plan to 3,000,000. This amendment will involve an increase of 1,150,000 shares of Class A Common Stock available for distribution." 1996 Proxy at 9-10. The ACS Board of Directors, including Deason, Rich, King, O'Neill and Rossi, included a "DESCRIPTION OF THE 1997 STOCK OPTION PLAN" that, under the heading "OPTIONS,"

stated: "The exercise price of an Incentive Stock Option shall be no less than 100% of the fair market value of the Company's Class A Common Stock at the time of the grant . . . . Fair market value is determined by reference to the stock's closing price on the date of the grant." 1996 Proxy at 10-11. Defendants, including Deason, O'Neill and Rossi who comprised the Compensation Committee and/or Special Compensation Committee and administered the 1988 Stock Option Plan and backdated options, along with the other members of the then-ACS Board, stated in the 1996 Proxy that "THE BOARD RECOMMENDS A VOTE 'FOR' APPROVAL OF THE AMENDMENTS TO THE COMPANY'S 1988 EMPLOYEE STOCK OPTION PLAN."

(b)    On or about November 14, 1997, defendants Deason, Rich, King, O'Neill and Rossi urged shareholders to approve the 1997 ACS Stock Option Plan. The 1997 Stock Option Plan replaced the Company's 1988 Stock Option Plan, which was terminated for new grants during fiscal year 1998 (except for the exercise of then existing option grants in September 1997). *See* 1998 10-K, Ex. 13.1 at 14. On August 5, 1997, the ACS Board adopted the 1997 Stock Option Plan, subject to shareholder approval. The ACS Board of Directors, including defendants Deason, Rich, King, O'Neill and Rossi, included a "DESCRIPTION OF THE 1997 PLAN" that, under the heading "OPTIONS," stated "The exercise price of an Incentive Stock Option shall be no less than 100% of the fair market value of ACS Class A Common Stock at the time of the grant . . . . Fair market value is determined by reference to the stock's closing price on the date of the grant." 1997 Proxy at 27. The Board of Directors, including defendants Deason, O'Neill and Rossi, stated in the 1997 Proxy Statement that "THE ACS BOARD RECOMMENDS THAT ACS STOCKHOLDERS VOTE FOR THE ADOPTION OF THE 1997 STOCK INCENTIVE PLAN." *Id.* at 30.

82.    Any suit by defendants to remedy the wrongs complained of herein would expose them to a substantial likelihood of liability for securities and proxy violations, as well as breach of

fiduciary duty. Therefore, they are hopelessly conflicted in making a supposedly independent determination of a demand that they cause the Company to bring this action:

      (a)    All of the defendants signed annual reports ACS filed with the SEC at various times between 1996 and 2005 (*see* ¶71). The Forms 10-K contained ACS's financial results and failed to account for the backdated stock options as compensation and an expense to the Company. As a result, the Company has taken a $40 million charge because it improperly accounted for its option grants subsequent to its initial public offering in 1994 through December 31, 2005. Moreover, ACS has disclosed that those financial statements may need to be restated. Any suit by defendants to remedy the wrongs complained of herein would expose them to a substantial likelihood of liability for securities and proxy violations, as well as breach of fiduciary duty. Therefore, they are hopelessly conflicted in making a supposedly independent determination of a demand that they cause the Company to bring this action; and

      (b)    All of the defendants participated in, approved, or through a conscious failure to act or abdication of duty, permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from ACS's shareholders and/or acting with negligence, gross negligence or recklessness disregarded the wrongs complained of herein, and therefore are not disinterested parties in the outcome of this litigation.

    83.    Demand upon the shareholders of ACS would be futile and is excused because ACS is a publicly traded corporation with more than 119 million common shares issued and outstanding and tens of thousands of shareholders scattered throughout the country. Making a demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders. The cost, time and attempts to comply with possible federal proxy law application would make the attempt futile.

## SPECIAL PLEADING MATTERS:
## TOLLING OF THE STATUTE OF LIMITATIONS

84.     The Counts alleged herein are timely.  As an initial matter, defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading proxy statements, by falsely reassuring ACS's public investors that ACS's option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

85.     ACS's public investors had no reason to know of the defendants' breach of their fiduciary duties until March 18, 2006, when the *Wall Street Journal* published its article detailing the option practices of ACS.

86.     Finally, as fiduciaries of ACS and its public shareholders, the defendants cannot rely on any limitations defense where they withheld from ACS's public shareholders the facts that give rise to the claims asserted herein, *i e* , that ACS's Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

## COUNT I

### Violations of §10(b) and Rule 10b-5 of the Exchange Act
### Against All Defendants

87.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

88.    Throughout the relevant period, defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct which allowed certain of the Company's officers and directors, including some of the defendants, to receive improper option grants and make no recompense to the Company.

89.    Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ACS not misleading.

90.    Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of the defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by ACS.

91.    Defendants acted with scienter throughout the relevant period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

92.    Each of the defendants participated in a scheme to defraud with the purpose and effect of defrauding ACS.

93.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violations of §14(a) of the Exchange Act
### Against All Defendants

94.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

95.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

96.    The 1995-2005 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the defendants were causing ACS to engage in an option backdating scheme, a fact which defendants were aware of and participated in from at least 1995.

97.    In the exercise of reasonable care, defendants should have known that the Proxy Statements were materially false and misleading.

98.    The misrepresentations and omissions in the Proxy Statements were material to plaintiffs in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

99.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

### Violations of §20(a) of the Exchange Act
### Against All Defendants

100.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

101.    Plaintiffs bring this claim against the individual defendants.

102.    Defendants named in this Count, by virtue of their positions with ACS and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of ACS within the meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause ACS to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Violations of §16(b) of the Exchange Act
### Against Defendants Rich and King

103.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

104.    Section 16(b) of the Exchange Act provides that if a person, who is an officer or director of an issuer of a class of registered equity securities, purchases and sells or sells and purchases shares of any equity security of such issuer within a period of less than six months, any profits arising from those transactions are recoverable by the issuer or by a shareholder suing derivatively on its behalf.

105.    SEC Rule 16b-3(d) provides an exemption for "transactions between an issuer and its officers or directors" if the transaction satisfies certain conditions. The Rule requires, *inter alia*, that the Board or a committee of non-employee directors of the Board approve the transaction in advance and in good faith, as a gatekeeper, with an eye toward preventing speculative abuse by its officers

and directors. The SEC noted in the Release proposing the Rule that it sought to craft a rule that, consistent with the statutory purposes of §16(b), erected meaningful safeguards against the abuse of inside information by officers and directors without impeding their participation in legitimate compensatory transaction. Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 36356, 60 Fed. Reg. 53832, 53835, 60 SEC Docket 1141, 1995 WL 597472, at *3, *7 (Oct. 11, 1995).

106.    At all relevant times, defendants Rich and King were officers or directors of ACS.

107.    Under §16(b), the option grants received by Rich and King were purchases, and are matchable with the respective sales made by Rich and King within the six-month statutory period.

108.    As a result, Rich garnered short-swing profits in excess of $6 million, which is subject to disgorgement; and King garnered short-swing profits in excess of $1.1 million, which is subject to disgorgement.

## COUNT V

### Accounting

109.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

110.    At all relevant times, the defendants, as directors and/or officers of ACS, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

111.    In breach of their fiduciary duties owed to ACS and its shareholders, the defendants caused ACS, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of ACS and/or failed to properly investigate whether these grants had been improperly made. By this wrongdoing, the defendants breached their fiduciary duties owed to ACS and its shareholders.

- 61 -

112. The defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to certain of the defendants.

113. As a result of defendants' misconduct, ACS has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

114. Plaintiffs demand an accounting be made of all stock options grants made to any of the defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to any of the defendants, as well as the disposition of any proceeds received by any of the defendants via sale or other exercise of backdated stock option grants received by those defendants.

## COUNT VI

### Breach of Fiduciary Duty
### Against All Defendants

115. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

116. Each of the defendants agreed to and did participate with defendant Rich, among others, and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties the defendants owed to the Company.

117. The defendants have violated fiduciary duties of care, loyalty, candor and independence owed to ACS and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of ACS and its shareholders.

118. As demonstrated by the allegations above, defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to ACS

- 62 -

and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding defendants' option backdating scheme.

119.    By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward ACS and its public shareholders.

120.    As a proximate result of defendants' conduct, in concert with defendants Rich, O'Neill and Rossi, ACS has been injured and is entitled to damages.

### COUNT VII

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

121.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

122.    As officers and/or directors of ACS, the defendants participated in the wrongful acts of fraud and mismanagement alleged herein. They thereby breached their fiduciary duties of care, candor, loyalty and disclosure to ACS shareholders. They have thus exposed ACS to liability from, *inter alia*, class action suits for violation of the U.S. federal securities laws brought by and on behalf of those persons who purchased ACS's stock during the relevant period as well as investigations launched by the SEC and possibly the Internal Revenue Service, all of which threaten to further cost the Company millions of dollars in fines, penalties and increased professional fees.

123.    Defendants should be required to disgorge any and all gains unjustly obtained at the expense of ACS and its shareholders by way of their fraudulent conduct and breach of their fiduciary duties.

124.    The conduct outlined herein was not due to an honest error of judgment, but rather to the defendants' bad faith and was done knowingly, willfully, intentionally or recklessly.

125.    By reason of the foregoing, ACS has been damaged.

## COUNT VIII

### Abuse of Control Against All Defendants

126.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

127.    The defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, ACS, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at ACS. As a part of this scheme, defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding ACS.

128.    Defendants' conduct constituted an abuse of their ability to control and influence ACS.

129.    By reason of the foregoing, ACS has been damaged.

## COUNT IX

### Gross Mismanagement Against All Defendants

130.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

131.    Defendants had a duty to ACS and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of ACS.

132.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of ACS in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, defendants breached their duties of due care, diligence and candor in the management and administration of ACS's affairs and in the use and preservation of ACS's assets.

133.    During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused ACS to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to ACS, thus breaching their duties to the Company. As a result, defendants grossly mismanaged ACS.

134.    By reason of the foregoing, ACS has been damaged.

### COUNT X

### Constructive Fraud Against All Defendants

135.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

136.    As corporate fiduciaries, defendants owed to ACS and its shareholders a duty of candor and full accurate disclosure regarding the true state of ACS's business and assets and their conduct with regard thereto.

137.    As a result of the conduct complained of, defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from ACS's shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of ACS. Thus they have committed constructive fraud and violated their duty of candor.

138.    By reason of the foregoing, ACS has been damaged.

### COUNT XI

### Corporate Waste Against All Defendants

139.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

140.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, by giving away millions of dollars to defendants via the option backdating scheme, and by enabling defendant Rich to unjustly gain

approximately $18.4 million in his separation agreement, defendants have caused ACS to waste valuable corporate assets.

141.    As a result of defendants' corporate waste, they are liable to the Company.

## COUNT XII

### Unjust Enrichment Against All Defendants

142.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

143.    As a result of the conduct described above, defendants will be and have been unjustly enriched at the expense of ACS, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

144.    All the payments and benefits provided to the defendants were at the expense of ACS. The Company received no benefit from these payments. ACS was damaged by such payments.

145.    Certain of the defendants sold ACS stock for a profit during the period of deception, misusing confidential non-public corporate information. These defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of ACS. A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT XIII

### Against Defendants Rich, Deason, Blodgett, King, Edwards, Rexford, and Brophy for Rescission

146.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

147.    As a result of the acts alleged herein, the stock option contracts between defendants and ACS entered into during the relevant period were obtained through defendants' fraud, deceit, and abuse of control. Further, the backdated stock options were illegal grants and thus invalid as

- 66 -

they were not authorized in accordance with the terms of the publicly-filed Company stock option plans which were approved by ACS shareholders and filed with the SEC.

148.    All contracts which provide for stock option grants between defendants and ACS and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT XIV

### Against Defendants Rich, Deason, King, Blodgett, Edwards, Rexford and Brophy for Breach of Contract

149.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

150.    As a result of the backdating of options granted to them, defendants Rich, Deason, Blodgett, King, Edwards, Rexford and Brophy have breached their employment agreements with ACS and violated the Company's stock option plans, all of which provide that the exercise price of all of the stock options would be no less than the fair market value of the Company's common stock, measured by the publicly traded closing price for ACS stock, on the date of the grant.

151.    ACS and its shareholders have been damaged by defendants Rich, Deason, Blodgett, King, Edwards, Rexford and Brophy's breach of contract.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs demand judgment as follows:

A.      Against all of defendants and in favor of ACS for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duties, waste of corporate assets, gross mismanagement, and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and statutory provisions sued hereunder, including disgorging, attaching, impounding, imposing a

constructive trust on or otherwise restricting the value of improvidently granted stock options and/or the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of ACS have an effective remedy;

C.    Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, and accountants' and experts' fees, costs, and expenses; and

D.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: October 11, 2006          PROVOST & UMPHREY LAW FIRM, LLP
                                 JOE KENDALL
                                 State Bar No. 11260700
                                 WILLIE C. BRISCOE
                                 State Bar No. 24001788


                                 _____
                                          s/ Willie C. Briscoe
                                 WILLIE C. BRISCOE

                                 3232 McKinney Avenue, Suite 700
                                 Dallas, TX 75204
                                 Telephone: 214/744-3000
                                 214/744-3015 (fax)

                                 Liaison Counsel

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
TRAVIS E. DOWNS III
BENNY C. GOODMAN III
THOMAS G. WILHELM
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
MARIA V. MORRIS
MONIQUE C. WINKLER
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\Affiliated Computer Derivative\Con Cpt ACS.doc

<u>VERIFICATION</u>

I, WILLIE C. BRISCOE, hereby declare as follows:

1.      I am a member of the law firm of Provost & Umphrey Law Firm, LLP, counsel for plaintiffs in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiffs are absent from the County where I maintain my office.

Executed this 11th day of October, 2006 at Dallas, Texas.


_____
s/ Willie C. Briscoe
WILLIE C. BRISCOE

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 11, 2006, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

<u>s/ Willie C. Briscoe</u>
WILLIE C. BRISCOE

PROVOST & UMPHREY LAW FIRM, LLP
JOE KENDALL
State Bar No. 11260700
WILLIE C. BRISCOE
State Bar No. 24001788
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: 214/744-3000
214/744-3015 (fax)
E-mail: <u>wbriscoe@provostumphrey.com</u>

# EXHIBIT B

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|
| **DELAWARE** | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | U.S. | Circuit |
| **OVERALL CASELOAD STATISTICS** | Filings* | 1,077 | 1,190 | 1,797 | 1,362 | 2,028 | 1,004 | U.S. | Circuit |
| | Terminations | 1,419 | 1,448 | 1,516 | 1,507 | 1,478 | 1,020 | | |
| | Pending | 1,501 | 1,853 | 2,085 | 1,836 | 1,999 | 1,477 | | |
| | % Change in Total Filings — Over Last Year | | -9.5 | | | | | 74 | 6 |
| | % Change in Total Filings — Over Earlier Years | | | -40.1 | -20.9 | -46.9 | 7.3 | 34 | 3 |
| | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months** | .0 | .0 | .0 | 1.9 | 3.1 | .0 | | |
| **ACTIONS PER JUDGESHIP** | FILINGS — Total | 270 | 298 | 449 | 340 | 507 | 251 | 82 | 5 |
| | FILINGS — Civil | 233 | 264 | 414 | 306 | 462 | 233 | 73 | 5 |
| | FILINGS — Criminal Felony | 30 | 28 | 29 | 25 | 38 | 18 | 88 | 5 |
| | FILINGS — Supervised Release Hearings** | 7 | 6 | 6 | 9 | 7 | - | 87 | 4 |
| | Pending Cases | 375 | 463 | 521 | 459 | 500 | 369 | 48 | 5 |
| | Weighted Filings** | 367 | 422 | 534 | 424 | 516 | 379 | 71 | 4 |
| | Terminations | 355 | 362 | 379 | 377 | 370 | 255 | 69 | 4 |
| | Trials Completed | 15 | 20 | 19 | 23 | 18 | 16 | 65 | 3 |
| **MEDIAN TIMES (months)** | From Filing to Disposition — Criminal Felony | 9.3 | 9.4 | 9.1 | 8.3 | 9.8 | 8.0 | 56 | 2 |
| | From Filing to Disposition — Civil** | 16.8 | 10.9 | 14.0 | 11.2 | 8.2 | 12.6 | 91 | 5 |
| | From Filing to Trial** (Civil Only) | 26.0 | 23.5 | 26.0 | 24.0 | 22.5 | 21.0 | 49 | 3 |
| **OTHER** | Civil Cases Over 3 Years Old** — Number | 142 | 156 | 65 | 66 | 99 | 77 | | |
| | Civil Cases Over 3 Years Old** — Percentage | 10.6 | 9.1 | 3.4 | 3.9 | 5.4 | 5.5 | 76 | 5 |
| | Average Number of Felony Defendants Filed Per Case | 1.2 | 1.2 | 1.2 | 1.3 | 1.1 | 1.3 | | |
| | Jurors — Avg. Present for Jury Selection | 39.60 | 39.82 | 38.50 | 34.98 | 33.84 | 32.68 | | |
| | Jurors — Percent Not Selected or Challenged | 24.1 | 22.8 | 20.9 | 24.0 | 24.4 | 19.9 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 930 | 32 | 6 | 233 | 12 | 6 | 20 | 76 | 52 | 160 | 132 | 51 | 150 |
| Criminal* | 117 | - | 26 | 14 | 29 | 20 | - | 2 | 5 | 10 | 2 | - | 9 |

* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not
** See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **TEXAS NORTHERN** | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | Numerical Standing | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | | Filings* | 5,646 | 5,895 | 6,560 | 6,985 | 6,591 | 5,991 | U.S. | Circuit |
| | | Terminations | 5,745 | 6,179 | 7,191 | 6,111 | 6,413 | 6,406 | | |
| | | Pending | 4,326 | 4,390 | 4,686 | 5,455 | 4,496 | 4,342 | | |
| | % Change in Total Filings | Over Last Year | | -4.2 | | | | | 46 | 5 |
| | | Over Earlier Years | | | -13.9 | -19.2 | -14.3 | -5.8 | 61 | 8 |
| | Number of Judgeships | | 12 | 12 | 12 | 12 | 12 | 12 | | |
| | Vacant Judgeship Months** | | .0 | .0 | 8.5 | 2.4 | 18.4 | 12.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 470 | 491 | 547 | 582 | 549 | 499 | 31 | 5 |
| | | Civil | 376 | 399 | 452 | 479 | 462 | 431 | 25 | 3 |
| | | Criminal Felony | 64 | 61 | 66 | 78 | 64 | 68 | 54 | 6 |
| | | Supervised Release Hearings** | 30 | 31 | 29 | 25 | 23 | - | 26 | 3 |
| | Pending Cases | | 361 | 366 | 391 | 455 | 375 | 362 | 54 | 8 |
| | Weighted Filings** | | 493 | 495 | 548 | 581 | 520 | 517 | 32 | 6 |
| | Terminations | | 479 | 515 | 599 | 509 | 534 | 534 | 34 | 5 |
| | Trials Completed | | 24 | 29 | 28 | 27 | 24 | 28 | 24 | 3 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 7.2 | 7.1 | 6.7 | 5.9 | 6.3 | 5.9 | 26 | 3 |
| | | Civil** | 7.4 | 8.6 | 7.4 | 7.2 | 6.6 | 7.1 | 11 | 3 |
| | From Filing to Trial** (Civil Only) | | 20.0 | 20.7 | 21.7 | 18.6 | 18.7 | 23.3 | 21 | 4 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 146 | 49 | 29 | 126 | 69 | 86 | | |
| | | Percentage | 4.3 | 1.4 | .8 | 2.8 | 1.8 | 2.3 | 28 | 4 |
| | Average Number of Felony Defendants Filed Per Case | | 1.5 | 1.6 | 1.5 | 1.5 | 1.7 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 39.54 | 40.42 | 51.06 | 50.46 | 56.30 | 47.80 | | |
| | | Percent Not Selected or Challenged | 36.2 | 34.8 | 43.9 | 54.9 | 54.1 | 52.7 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 4516 | 187 | 150 | 1759 | 71 | 46 | 189 | 561 | 233 | 312 | 534 | 4 | 470 |
| Criminal* | 767 | 10 | 139 | 154 | 160 | 95 | 48 | 24 | 46 | 35 | 14 | 11 | 31 |

* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not
** See "Explanation of Selected Terms."

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEFFREY T. STRAUSS, derivatively on behalf of AFFILIATED COMPUTER SERVICES, INC., | : : : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 06-318 (SLR) |
| | : | |
| JEFFREY A. RICH, MARK A. KING, and AFFILIATED COMPUTER SERVICES, INC., | : : : | |
| | : | |
| Defendants. | : | |

NOMINAL DEFENDANT AFFILIATED COMPUTER SERVICES, INC.'S
PRE-DISCOVERY DISCLOSURES PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 26(a)(1)

Nominal Defendant Affiliated Computer Services, Inc. ("ACS") by and through

its attorneys, makes the following disclosures pursuant to Federal Rule of Civil Procedure

26(a)(1) (the "Disclosures").

PRELIMINARY STATEMENT

The Disclosures are made without waiver of, or prejudice to, any objections ACS

may have to any discovery requests or deposition testimony. ACS expressly reserves all such

objections including, but not limited to, objections based on (a) relevance, (b) any applicable

privilege, including, without limitation, the attorney-client privilege and the attorney work

product doctrine, (c) privacy, (d) undue burden and (e) overbreadth. ACS also reserves the right

to object to the admissibility in evidence of these disclosures and/or the subject matter thereof.

ACS reserves the right to amend and/or supplement the Disclosures should further information become available to them after the date of the Disclosures, including, without limitation, information obtained through discovery in this action, through further investigation by ACS's counsel or from other sources.

## DISCLOSURES

A.    Rule 26(a)(1)(A):  Individuals Likely To Have Discoverable
      Information Supporting ACS's Defenses

The individuals known to ACS at the present time who are likely to have discoverable information that ACS may use to support their defenses (except solely for impeachment) are (i) plaintiff in this action, (ii) all principals, agents, officers and/or employees of ACS, and (iii) the following specific persons and/or entities:

| Name | Subject Matter | Address |
|---|---|---|
| Jeffrey A. Rich | Plaintiff's Allegations | (c/o counsel)<br>Allen Terrell<br>Richards, Layton & Finger<br>One Rodney Square<br>P.O. Box 551<br>Wilmington, DE 19899<br>(302) 651-7732 |
| Mark A. King | Plaintiff's Allegations | (c/o counsel)<br>Allen Terrell<br>Richards, Layton & Finger<br>One Rodney Square<br>P.O. Box 551<br>Wilmington, DE 19899<br>(302) 651-7732 |
| Darwin Deason | ACS's stock option grant practices and compensation committee approval for stock option grants enumerated in the Complaint. | c/o William L. Deckelman, Jr., Esq.<br>Affiliated Computer Services, Inc.<br>2828 N. Haskell<br>Dallas, TX 75204<br>(214) 841-6111 |

2

| Name | Subject Matter | Address |
|------|----------------|---------|
| Frank Rossi | ACS's stock option grant practices and compensation committee approval for stock option grants enumerated in the Complaint. | c/o William L. Deckelman, Jr., Esq.<br>Affiliated Computer Services, Inc.<br>2828 N. Haskell<br>Dallas, TX 75204<br>(214) 841-6111 |
| Joseph P. O'Neill | ACS's stock option grant practices and compensation committee approval for stock option grants enumerated in the Complaint. | c/o William L. Deckelman, Jr., Esq.<br>Affiliated Computer Services, Inc.<br>2828 N. Haskell<br>Dallas, TX 75204<br>(214) 841-6111 |
| William L. Deckelman, Jr. | Plaintiff's allegations and specific stock option grants listed enumerated in the Complaint | Affiliated Computer Services, Inc.<br>2828 N. Haskell<br>Dallas, TX 75204<br>(214) 841-6111 |
| Wayne Lewis | Plaintiff's allegations and specific stock option grants listed enumerated in the Complaint | c/o William L. Deckelman, Jr., Esq.<br>Affiliated Computer Services, Inc.<br>2828 N. Haskell<br>Dallas, TX 75204<br>(214) 841-6111 |
| Kimberly Watson | Plaintiff's allegations and specific stock option grants listed enumerated in the Complaint | c/o William L. Deckelman, Jr., Esq.<br>Affiliated Computer Services, Inc.<br>2828 N. Haskell<br>Dallas, TX 75204<br>(214) 841-6111 |
| David Selzer | Plaintiff's allegations and specific stock option grants listed enumerated in the Complaint | c/o William L. Deckelman, Jr., Esq.<br>Affiliated Computer Services, Inc.<br>2828 N. Haskell<br>Dallas, TX 75204<br>(214) 841-6111 |

B.    Rule 26(a)(1)(B):  Documents That ACS May Use To Support Its Defenses

The documents presently known to ACS that are in its possession, custody or control and that they may use to support their defenses (except solely for impeachment) include the following:  (i) documents concerning ACS's Compensation Committee from July 2000 through July 2002, (ii) documents concerning ACS's stock option granting practices from July 2000 through July 2002, (iii) documents concerning specific stock option grants to Jeffrey A. Rich on July 11, 2000 and to Jeffrey A. Rich and Mark A. King on July 23, 2002, and (iv) documents being produced with the Disclosures Bates-stamped ACSSTR00001-0000362.

These documents are located at either ACS's headquarters or with their counsel. Additional documents that defendants may use to support their defenses (except solely for impeachment) are in the plaintiffs' possession or the possession of plaintiffs' representatives and/or advisors and/or in the public domain, and also may be in the possession of various third parties.

C.    Rule 26(a)(1)(C):  Computation of Damages

ACS has not engaged in a damages calculation or analysis at this time.

D.    Rule 26(a)(1)(D):  Insurance Agreements

ACS does not possess insurance agreements under which an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action, or to indemnify or reimburse for payments made to satisfy the judgment.

4

Dated: March 5, 2007

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By:    /s/ Edward B. Micheletti
       Edward P. Welch (I.D. No. 671)
       Edward B. Micheletti (I.D. No. 3794)
       Nicole DiSalvo (I.D. No. 4662)
       One Rodney Square, P.O. Box 636
       Wilmington, Delaware 19899
       (302) 651-3000

       Attorneys for Nominal Defendant
       Affiliated Computer Services, Inc.

5